**ACKERLEY COMMUNICATIONS OF MASSACHUSETTS, INC., Plaintiff,**

v.

**CITY OF SOMERVILLE, Defendant.**

**Civ. A. No. 86–3222–WD.**

United States District Court,
D. Massachusetts.

July 8, 1988.

George A. Berman, Posternak, Blankstein & Lund, Boston, Mass., for plaintiff.

Peter L. Koff, Weston, Patrick, Willard & Redding, Boston, Mass., Anthony P. Sullivan, City of Somerville Law Dept., Somerville, Mass., for defendant.

## MEMORANDUM

WOODLOCK, District Judge.

For more than ten years the City of Somerville, Massachusetts, has sought to regulate billboard signs through zoning regulation. One such effort was found constitutionally defective in 1985. Now before me is a challenge to Somerville's 1986 revision of its regulatory scheme.

In this action, the plaintiff, Ackerley Communications of Massachusetts, Inc. ("Ackerley"), challenges the constitutionality of revised Article 10 [1] of Somerville's zoning ordinance. Revised Article 10 regulates the size and location of all signs in the City, and prohibits the erection or maintenance of signs that fail to conform to its requirements.

Section 10.7,[2] which is denominated "Nonconforming Signs," constitutes the exemptive section of revised Article 10. It

---

1. Revised Article 10 in its entirety is set forth in Appendix A.

2. This section provides:

Section 10.7.1. This Article shall apply to any nonconforming sign which at any time during the year preceding the effective date of this Article, or at any time thereafter, advertises or promotes the sale of goods, products, or services not sold, provided, or manufactured upon the same premises on which the sign is located.

Section 10.7.2. Except as provided in Section 10.7.1, this Article shall not apply to any nonconforming sign legally erected prior to the effective date of this Article.

Section 10.7.3. All nonconforming signs subject to Section 10.7.1 shall be removed within 120 days of the effective date of this Article or within 120 days of the date on which the sign first becomes subject to Section 10.7.1, whichever occurs later.

Section 10.7.4. Any legally erected nonconforming sign which has been destroyed or damaged to such an extent that the cost of restoration would exceed thirty-five (35) percent of the replacement value of the sign at the time of the destruction or damage, shall not be repaired, rebuilt or altered except in accordance with the provisions of this Article.

Section 10.7.5. An electric time and temperature sign, which is an integral part of a legally erected nonconforming sign may be repaired or replaced with no restriction on the cost of repair or replacement.

contains two subsections especially important to analysis of the claims in this matter. Subsection 10.7.1 is a retrospective provision which looks to the period beginning one year before the effective date of the revised Article to provide the operative time for evaluating nonconforming signs. Subsection 10.7.2 is a grandfather provision for certain existing nonconforming signs erected before the effective date of the revised Article.

The exemptive section is convoluted and works obliquely. Under Section 10.7.1, a nonconforming sign is expressly prohibited if—at any time after the operative date of the provision, July 28, 1985—that sign advertised or promoted the sale of goods, products and services not sold, provided or manufactured upon the premises where the sign is located. The unarticulated negative pregnant of this formulation is, as the parties agree, that an otherwise nonconforming sign, *e.g.* a billboard, has grandfather protection under Section 10.7.2 and is exempted from prohibition by Article 10 if it has been used since July 28, 1985 exclusively to deliver either: (a) on-premise [3] commercial advertising or promotions, or (b) noncommercial messages of any kind, or both. Otherwise, the sign is deemed an off-premise commercial sign unprotected by any exemption.

Thus, as constructed, Section 10.7 functions in two dimensions, the substantive and the temporal. In the substantive dimension, a typology of nonconforming signs is established. One class consists of off-premise commercial signs; these are expressly prohibited. The second class consists of the remaining signs—on-premise commercial signs and noncommercial signs of any kind; these *may* be exempt from prohibition. Whether a given sign in the second class is, in fact, exempt depends upon the temporal dimension.

In the temporal dimension, the operative date of July 28, 1985, establishes an additional test of consistency of use to determine whether a potentially exempt nonconforming sign may remain undisturbed by revised Article 10. A sign, otherwise exempted on substantive grounds, becomes tainted—and subject to removal—if at any time after July 28, 1985, it has been used for the prohibited purpose of delivering an off-premise commercial message.

The interplay between the substantive and temporal dimensions of the exemptive section defines the battleground where the constitutional dispute in this case is fought.

Ackerley's constitutional challenge to Article 10 is mounted on four fronts. Ackerley contends:

—That revised Article 10, by choosing an operative date in its exemptive section which does not permit those using nonconforming signs on the effective date to change the content and satisfy the noncommercial exception prospectively, violates the First Amendment by impermissibly favoring commercial over noncommercial messages;

—That revised Article 10 violates the First Amendment by impermissibly favoring on-premise commercial advertising over off-premise commercial advertising;

—That revised Article 10 violates the constitutional prohibition against *ex post facto* laws as well as the constitutional guarantee of due process because, by choosing an operative date well before the effective date, it has—without fair warning—exposed the plaintiff to penalties for conduct that was legal at the time it occurred; and

—That revised Article 10 constitutes an unconstitutional taking of private property without just compensation.

Somerville has responded with what it contends is a compulsory counterclaim. This counterclaim seeks enforcement of Article 10 under state zoning law if Ackerley's federal constitutional challenges are rejected.

---

**3.** "On-premise" signs are those which advertise businesses, goods, or services available on the properties where the signs are located. "Off-premise" signs are those which advertise businesses, goods, or services available elsewhere. Billboards, by and large, fall in the category of "off-premise" signs.

With the cooperation of the parties, discovery was expedited to permit an advanced trial on the merits. In addition, the parties cooperated in reopening the evidence to provide an adequate basis for findings concerning the actual impact of full enforcement of Article 10. By agreement of the parties, interim enforcement of the ordinance has not been undertaken pending resolution of the constitutional issues.

The constitutional issues will be disposed of in accordance with this Memorandum by a declaratory judgment upholding revised Article 10 against plaintiff's challenge.

I decline, however, to resolve the problems of enforcement raised by the counterclaim because those problems involve essentially state law questions and concerns. The counterclaim will, accordingly, be dismissed.

This Memorandum sets forth the findings of fact and conclusions of law required for resolution of this non-jury matter. Fed.R.Civ.P. 52.

## I. FINDINGS OF FACT

The City of Somerville, Massachusetts, is a compact and densely populated older urban locality with limited open space. It is the third most populous city in the Boston metropolitan area. Somerville's development predated the enactment of its first comprehensive zoning ordinance in 1925. As a result, commercial, industrial and residential uses—while ostensibly ordered by zoning—exist side by side in Somerville through the continuation of prior nonconforming uses.

As part of the Boston metropolitan area, Somerville has a wide variety of communication media available to its citizens. These include network affiliated, local and cable television channels and radio stations from throughout metropolitan Boston, together with national, regional and local newspapers and signs which conform to revised Article 10.

For some period of time the residents of the City, its political leaders and its planners have been concerned with revitalizing the City economically and, in a related as well as independent sense, aesthetically. The problems of signs generally—and billboards in particular—have been a focus of these concerns. Article 10 is a regulatory expression of that concern.

### A. Ackerley's Business

Ackerley is a company engaged in the outdoor advertising business. It leases property on which it erects sign structures and then makes the space on such structures available to the public for commercial, political, charitable and social messages. Those signs are generally known as billboards.

The erection and maintenance of Ackerley's billboards in Massachusetts is subject to the permit authority of the state's Outdoor Advertising Board ("OAB"). Mass. Gen.L. ch. 93, §§ 29–33 and ch. 93D. Each of Ackerley's current billboards was issued a permit prior to erection. Until 1982, the permits were subject to annual renewal. After 1982, the Commonwealth began to issue five-year permits.

Permits granted by the OAB are subject, under Massachusetts law, to municipal zoning amendments. 311 Code of Massachusetts Regulations ("C.M.R.") 3.01(2). See also 311 C.M.R. 3.04(7) ("No permit shall be granted or renewed for the location or maintenance of a Sign within a city or town except where such location or maintenance is in conformity with applicable city and town ordinances"). Ackerley maintains approximately 3,000 signs subject to this regulatory regime in 64 cities and towns in Massachusetts.

In Somerville, it maintains 81 sign faces at 43 separate locations.[4] All of Ackerley's Somerville signs have been standing for at least 10 years, and a substantial majority have been standing for over 30 years. All of Ackerley's Somerville billboards are maintained pursuant to leases with the owners of the various properties upon which the billboards are located. Under the leases, Ackerley typically erects its billboards on a roof or a parking lot of the

---

**4.** Most of Ackerley's Somerville structures have multiple sign faces.

leased premises. Ackerley's current Somerville leases have varying expiration dates: leases for 24 of the billboards at issue here will not expire until after 1990, and leases for eleven of the billboards will not expire until after 1995. The leases generally contain clauses that provide a basis for Ackerley to reduce payments if government regulations restrict billboards.

Ackerley's signs have historically been used to display both commercial and noncommercial messages. Prior to July 28, 1986, the effective date of the challenged ordinance, Ackerley's signs were used primarily for off-premise commercial messages. However, even during that time Ackerley devoted a substantial amount of advertising space to noncommercial messages, occasionally donating advertising space on its Somerville billboards to public service organizations or using its billboards to carry editorial messages expressive of its own views.[5] Before passage of revised Article 10, Ackerley on average donated 15% of its advertising space at any given time to noncommercial organizations. Ackerley has also leased space on its billboards to political candidates.[6]

Ackerley's billboard rates are not modest. A 12 by 25 foot billboard rents for an average of $400 per month and a 14 by 48 foot billboard rents at approximately $3,000 per month. Ackerley calculated that its gross revenue from billboards in Somerville, before adjustments were made in light of revised Article 10, was in the range of $400,000 to $450,000 annually.

None of Ackerley's signs in Somerville conforms to the location, height, or size requirements of Article 10; consequently, all of the signs are "nonconforming" under Section 10.7 of the Ordinance. Moreover, with no more than four to seven possible

exceptions, all of Ackerley's billboards, were used between July 28, 1985—the operative date under the ordinance—and July 28, 1986—the effective date of the Ordinance—or thereafter, to advertise the sale of goods or services not available on the premises where the billboards are located. In other words, the vast majority of Ackerley's billboards have concededly not been used exclusively since the operative date to carry either class of message—on-premise commercial advertising or noncommercial statements of any kind—necessary to bring them within the protection of the grandfather clause.

Thus, despite the noncommercial messages that many of the billboards have periodically carried in the past and irrespective of Ackerley's expressed and demonstrated current intent to use most, if not all, of its billboards for noncommercial messages or on-premise advertising for as long as commercial billboards are disfavored in Somerville, full enforcement of Section 10.7 will require that virtually all Ackerley's billboards be removed.

### B. *Somerville's Regulatory Efforts*

Article 10 of the Zoning Ordinance is the most recent product of a long standing effort by Somerville to ameliorate the City's economic difficulties and improve the City's aesthetic appearance by reducing the number of visually displeasing sign and billboard structures.

In 1969, 17 years before the passage of the current revised Article 10, a "Comprehensive Plan" was prepared for the City by the Planning Services Group, Inc. of Cambridge. The plan contained recommendations for revitalizing the City's Davis

---

5. For example, Ackerley billboard space has been used by the Somerville Housing Authority, Boston's Museum of Science, Displaced Homemakers, Big Brothers, and the Governor's Highway Safety Bureau; and Ackerley has used its Somerville billboards to editorialize about the Iran hostage crisis, and to commemorate the 20th anniversary of the assassination of President John Kennedy.

6. During the 1986 election campaigns, for example, Ackerley leased billboard space to: Vincent Piro, who was running for the Massachusetts State Senate; John McGonigle, who was running for Middlesex County Sheriff; Paul Sullivan, who was running for Middlesex County Commissioner; Arthur Onessimo, who was running for Middlesex County Commissioner; and Clark Abt, who was running for the United States House of Representatives.

Square area[7] which included advice to "[r]educe the clutter of business signs in the square" generally, and specifically to "[r]educe the number of rooftop bill-boards." This type of advice continued to appear in planning documents prepared for the City throughout the 1970's and into the 1980's. These planning views provided the policy basis for Article 10.

### 1. The 1977 Ordinance

In 1977, Somerville enacted Article 10 to its Zoning Ordinance. This was the City's initial attempt to legislate the planning rec-ommendations it had been receiving re-garding signs. This first version of Article 10 was a comprehensive sign regulatory scheme, which had the practical effect of banning all off-premise billboards in the City while extending grandfather status to existing on-premise commercial signs. Un-der the 1977 Article 10, nonconforming signs were given a five-year grace period before they were required to be removed.

When the five-year period expired in 1982, 118 Ackerley billboards remained in Somerville in violation of the Ordinance. In response to Ackerley's recalcitrant stance, Somerville commenced, pursuant to Mass.Gen.L. ch. 40A, § 7, a zoning enforce-ment action in the Massachusetts Superior Court to compel Ackerley to remove its nonconforming billboards.

In that action, the 1977 version of Article 10 was declared unconstitutional on its face by my present colleague, William Young, then an Associate Justice of the Massachu-setts Superior Court. *City of Somerville v. Ackerley Communications of Massachusetts, Inc.*, Middlesex No. 83–6299 (Feb. 25, 1985). The 1977 Ordinance distin-guished between "accessory" and "nonac-cessory" signs; it permitted accessory signs, but prohibited nonaccessory signs. An accessory sign under the Ordinance was a sign which identified "the occupant of the premises, the business transacted thereon, or advertise[d] the property itself as for sale or to let." *Id.* at 6.

Judge Young found the Ordinance left to the discretion of City officials the determi-nations as to whether signs were accessory or nonaccessory. Making these determina-tions required Somerville officials to distin-guish permissible from nonpermissible signs on the basis of each sign's relative commercial and noncommercial content. However, the Ordinance did not set out any standards for making the determinations. Consequently, Judge Young observed that the Ordinance "... 'present[ed] a real dan-ger of curtailing noncommercial speech in the guise of regulating commercial speech.'" *Id.* at 7, *quoting Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 536–37, 101 S.Ct. 2882, 2907–08, 69 L.Ed.2d 800 (1981) (Brennan, J., dissenting). He concluded that the Ordinance allowed Som-erville arbitrarily to allow or prohibit signs on the basis of content. Accordingly, Judge Young found the 1977 version of Article 10 "unconstitutional on its face," *id.* at 11, as either "unduly vague" or imper-missibly "favoring ... commercial over noncommercial speech." *Id.* at 10.

### 2. The September 1985 Proposal

After Judge Young issued his decision in February 1985 striking down the 1977 ver-sion of Article 10, Somerville immediately began the process of revising the Article in order to cure its constitutional difficulties. On September 12, 1985, Eugene C. Brune, Mayor of Somerville, submitted a revised version of Article 10 to the Board of Alder-men. As proposed, the new Ordinance con-tained a variety of restrictions on the size and location of all signs in Somerville. None of Ackerley's existing signs con-formed to all of the proposed Article 10's requirements, primarily because they ex-ceeded the maximum area restrictions or were located on roofs.

As proposed in September 1985, Article 10 contained a "grandfather" provision for existing signs which provided:

Section 10.7 *Nonconforming Signs.*

Section 10.7.1. This Article shall not apply to any nonconforming sign legally

---

**7.** Davis Square is a major commercial area in Somerville. Similar recommendations have

been made since that time as to Union Square, another major commercial area in the city.

erected prior to the effective date of this Article, except as provided in Section 10.-7.2.

Section 10.7.2. This Article shall apply to any nonconforming sign used *at the time this Article becomes effective, or at any time thereafter*, to advertise or otherwise promote the sale or existence of goods, products, services or business offered, sold manufactured, or conducted elsewhere than upon the same premises on which the sign is located. Such nonconforming signs shall be removed within 120 days of the effective date of this Article or within 120 days of the time they are so used, whichever occurs later. (emphasis supplied)

### 3. Somerville and Ackerley Negotiate

After the proposed revision to Article 10 was submitted to the Board of Aldermen, Ackerley contacted Somerville officials and asked for an opportunity to discuss a resolution of the differences between them and perhaps forestall further litigation. In particular, Ackerley suggested that it would be willing to remove some billboards, relocate others, and donate some advertising space to public service messages of direct interest to the people of Somerville in exchange for being permitted to maintain a specific number of billboards in designated areas.

A period of negotiations followed. Ackerley representatives met on several occasions with Somerville officials, primarily Thomas Pelham, Somerville's Director of the Office of Planning and Community Development; Anthony Sullivan, the City Solicitor; and Mayor Brune. In April 1986, the negotiations between Ackerley and Somerville ended without agreement. At the final negotiating session between the parties on April 15, 1986, Louis Nickinello, Ackerley's representative, indicated to Mayor Brune that if the proposed Ordinance were enacted, Ackerley would conform to the requirements of the Ordinance by using its Somerville billboards exclusively for either noncommercial messages or to advertise products offered for sale on the premises.

Mr. Nickinello's comments about compliance convinced the Mayor that Ackerley would pursue a strategy designed to keep its billboard structures in place. The Mayor decided, therefore, to revise Article 10 further to ensure that the fewest possible Ackerley billboards would remain standing.

### 4. The 1986 Enactment

On May 8, 1985, soon after the April 15th session with Ackerley, Mayor Brune, after consulting with legal advisers, submitted a further revised version of Article 10 to the Board of Aldermen. The version of Article 10 proposed on May 8, 1986 was identical in all material respects to the Ordinance proposed on September 12, 1985, except for Sections 10.7.1. and 10.7.2., the provisions concerning existing, nonconforming signs.

The changes, about which Mayor Brune made no reference in his transmittal letter to the Board of Aldermen, significantly affected the operative date for exemptions for nonconforming signs. Under the May 8, 1986, proposal, any billboard used for off-premise commercial advertising on July 28, 1985, or thereafter, would not be protected. Thus, the owner of a nonconforming sign would not be in a position—under the May 8, 1986, proposal—to take prospective action to bring that sign within either the on-premise advertising or the noncommercial message exception, as would have been possible had the September 1985 proposal been enacted.

The Mayor's May 8, 1986 proposal was approved by the Somerville Planning Board and enacted by the Board of Aldermen with minimal discussion on July 24, 1986, and became effective on July 28, 1986. This is the version of Article 10 that is at issue in this litigation.

### 5. Intent and Impact

#### a. *Intent*

The overall intent of the sign regulation is set forth in the "Findings and Purpose" section of Article 10, Section 10.1. Section 10.1.1 states that the Article is based on four findings:

(a) The regulation of signs is necessary in order to preserve and enhance the

substantial governmental interests of the City of Somerville in its natural, scenic, historic, cultural, and aesthetic qualities;

(b) There is a substantial governmental interest in enhancing the physical appearance of all parts of the City of Somerville, including residential, commercial, and industrial areas;

(c) Regulating signs will improve the City's appearance, thereby attracting both permanent residents and commercial development;

(d) The regulations set forth in this Article will directly advance the public interest in aesthetics and other qualities by preserving and enhancing the appearance of residential, commercial and industrial areas; preserving and enhancing the appearance of public streets, parks and other public properties; and by minimizing the intrusiveness of sign structures.[8]

Section 10.1.2 states:

The purposes of this Article are to preserve and enhance the substantial interests of the City of Somerville in the appearance of the City; to preserve and enhance the public interest in aesthetics; to preserve and increase the amenities of the municipality; to control and reduce visual clutter and blight; and to carry out the authority conferred by General Laws, Chapter 40A and Chapter 93, Section 29.

The intent of providing an exception for noncommercial signs was set forth in the Planning Board's July 24, 1986 letter to the Aldermen recommending approval of Mayor Brune's May 8, 1986 proposal. The Planning Board, repeating Mayor Brune's words in his September 12, 1985 letter to the Aldermen proposing the initial revision, stated that "the intent of the [exemptive] provision is to ban nonconforming 'off-premise' signs used for commercial advertising but to allow nonconforming 'off-premise' signs which contain noncommercial messages." The Board observed that Sections 10.7.1 and 10.7.2 had "been drafted to conform to recent First Amendment decisions by the United States Supreme Court and other federal and state courts." In conclusion, the Board stated that while the exemptive provision "may mean that some billboards containing noncommercial messages will remain, we believe that the public interest in protecting freedom of speech outweighs the adverse impacts which the relatively small number of structures bearing noncommercial messages will have on the various public interests...."

Nowhere in the various statements of purpose and intent offered by Somerville is there an explanation offered for excepting on-premise commercial advertising. Nevertheless, it may be inferred, and I find, that Somerville chose to recognize the imperative needs of its local merchants to advertise their wares at the location of their shops.

There is also no contemporaneous explanation of Somerville's intent behind the fundamental change made in the operative date in the revision to Article 10. In his letter to the Aldermen by which he transmitted the May 8, 1986 proposed revision to the originally proposed revision of Article 10, Mayor Brune stated that "[t]his proposed ordinance is almost identical to the proposed ordinance which I submitted to you on September 12, 1985. A few very minor revisions have been made to incorporate informal suggestions made to me by members of the Planning Board." Apart from this brief general statement, there is no mention in the Mayor's letter of anything that bears on the changing of the operative date in Section 10.7.[9]

---

8. The Planning Board's July 24, 1986 letter of recommendation in support of the May 8, 1986 proposal cited two additional findings:

.  .  .  .  .

e. The control of signs has been recommended to the City in planning studies.

f. The control of signs is a recognized element of professional urban design and planning practice.

9. More than two months after the Mayor's May 8, 1986 letter and just four days before the Board of Aldermen voted to enact the current Article 10, Somerville's Office of Planning & Community Development sent a letter to the

I find that when Mayor Brune proposed his May 8th revision to the grandfather provision of the proposed Ordinance, he knew: (1) that Ackerley intended to maintain its signs in a fashion designed to conform to the September 1985 proposal; (2) that Ackerley owned most if not all of the existing off-premise, nonconforming signs in Somerville,[10] and consequently would be the only 'person' even potentially affected by the revision; (3) that few, if any, of Ackerley's billboards were likely to have been used exclusively for noncommercial purposes during the preceding year; and, consequently, (4) that the introduction in the revised Ordinance of an operative date one year before the effective date would assure removal of virtually all of Ackerley's billboards.

I further find that Mayor Brune in making his May 8th proposal intended that it would result in the removal of virtually all of Ackerley's billboards, not because they were Ackerley's, but because they were oversized structures, the continued presence of which would seriously undercut the aesthetic goals of the Ordinance; and that he intended that result without any intent that the enactment would favor certain viewpoints or ideas at the expense of others.

### b. *Impact*

#### (i) As a Theoretical Matter

It is theoretically possible for a nonconforming sign to satisfy the grandfather provisions of revised Article 10 through consistent use after July 28, 1985 for either on-premise advertising or promotion or the delivery of noncommercial messages, or both.

#### (ii) As a Practical Matter

As a practical matter, however, it is unlikely that the theoretical possibility of conforming by consistent delivery of noncommercial speech—as opposed to on-premise commercial messsages—was realized in any significant number of circumstances. In response to a court order dated December 23, 1987, the parties jointly retained R.M. Bradley & Co., Inc. for the purpose of preparing a catalogue of existing nonconforming signs in Somerville. R.M. Bradley surveyed the nonconforming signs on all of the major thoroughfares in Somerville during December 1987–January 1988. The company then prepared a catalogue which identified each surveyed nonconforming sign by location and zoning violation and contained a picture of each. The evidence was reopened to receive the R.M. Bradley catalogue.

The parties have stipulated that the catalogue is not a complete record of each and every nonconforming sign in Somerville. However, they have also agreed that it provides a fair approximation of the total number of nonconforming signs on the major thoroughfares in Somerville, and, as such, it provides a reasonably precise basis from which to assess the actual impact of the challenged Ordinance.

The catalogue identifies 65 Ackerley billboards, all of which would have to be removed pursuant to Section 10.7.1 of the Ordinance.[11] Most, if not all, of these billboards have been used to carry noncommercial messages at one time or another and, as more fully developed below, will be used to carry noncommercial messages in the future if not eliminated by enforcement of revised Article 10.

---

Board of Aldermen in which it explained its support for the proposed Ordinance. In this letter the Planning Board merely restated the explanation of the intent behind Section 10.7 that Mayor Brune had offered in his letter of September 12, 1985. The Planning Board failed even to mention, let alone explain, the change in the operative date under Section 10.7 that had occurred between the September and May proposals.

**10.** At the time of trial in this action, there were 83 off-premise signs or billboards located within the 4.2 square miles that constitute Somerville. Of these, 81 were owned and maintained by Ackerley, and the other two were maintained by a company that is owned by Ackerley.

**11.** The catalogue itself identifies 67 such Ackerley billboards. However, the parties have stipulated that two of these 67 billboards were incorrectly identified by R.M. Bradley as Ackerley billboards in Somerville. The billboard depicted in Picture 17 is not owned by Ackerley, and that depicted in Picture 25 is located in the City of Cambridge, Massachusetts.

By contrast, the catalogue identifies at least 200 nonconforming signs at 196 other separate locations, the overwhelming majority of which are plainly commercial, and all of which would survive enforcement of revised Article 10 because their messages deal with on-premise activity.[12]

Extrapolating from the survey, I find that the effect of the Ordinance will be to eliminate virtually all noncommercial messages conveyed by nonconforming signs in Somerville while leaving undisturbed nonconforming signs delivering on-premise commercial advertising. The only arguably noncommercial nonconforming signs which will remain after enforcement of revised Article 10 will be those which identify essentially eleemosynary institutions.

The parties agree that the 1986 version of Article 10 permits the use of existing nonconforming, on-premise commercial signs to display noncommercial messages; and the Ordinance would not require the removal of any such signs were they to be used in the future to display noncommercial messages; and the Ordinance would not require the removal of any such signs were they to be used in the future to display noncommercial messages.[13] I find, however, no evidence that any of these on-premise, nonconforming commercial signs has ever actually been used—or is likely in the future to be used—for a noncommercial purpose.

The parties are in agreement that nonconforming, on-premise commercial signs that have been afforded grandfather protection under Section 10.7.2 may be converted to noncommercial use by the present or successor owners of the properties. For example, the on-premise nonconforming commercial sign "Hair Flair By Larry," could be converted to a noncommercial sign by the current or a subsequent property owner at that location. Such continuations of prior nonconforming use would apparently enable the converted sign to retain protected grandfather status in a manner analogous to the Massachusetts law of prior nonconforming uses as set out in Mass. Gen.L. ch. 40A, § 6.

I recognize that ch. 40A, § 6 by its terms "does not apply to billboards, signs and other advertising devices subject to the provisions of sections twenty-nine through thirty-three, inclusive, of chapter ninety-three, and to chapter ninety-three D," and, consequently, the Massachusetts law of prior nonconforming uses does not technically apply to the subject matter of this lawsuit.[14] However, there was agreement by the parties, after inquiry by me, that all on-premise nonconforming commercial signs that have been afforded grandfather protection under Section 10.7.2 will effec-

---

12. Of these approximately 200 nonconforming signs identified in the R.M. Bradley survey as exempt from prohibition by Article 10, all are manifestly commercial with the exception of four. These four signs advertise: (1) a "YMCA" (picture # 97); (2) "Somerville Boys & Girls Club" (picture # 110); (3) "Somerville Hospital" (picture # 168); and (4) "The Somerville Home" (picture # 175). In addition to these four, there are at least three other on-premise, nonconforming signs in Somerville which would survive the enforcement of the ordinance and which are not overtly commercial. These three advertise: (a) "Jeane Juggan Residence and Pavilion, Little Sisters of the Poor"; (b) "Visiting Nurse Foundation, Mystic–Charles ContinuCare, and (c) "St. Catherine of Genoa." These three signs were not included in the R.M. Bradley catalogue; however, pictures of them have been introduced into evidence as Exhibit 36. The parties agree that these seven on-premise, nonconforming signs are not subject to Section 10.-7.1. They disagree as to whether the latter three signs are commercial or noncommercial—Ack-erley contending they are all commercial, and Somerville maintaining that they are noncommercial.

13. For instance, the Ordinance would permit a Star Market bearing an on-premise, nonconforming "STAR MARKET" sign, to use that sign to convey a "BAN STAR WARS" message without running afoul of the Ordinance's proscriptions.

14. Mass.Gen.L. ch. 93, §§ 29–33 and Mass.Gen.L. ch. 93D constitute the provisions of Massachusetts law that respectively regulate "outdoor advertising signs and devices within public view" and "outdoor advertising adjacent to the interstate and primary highway system." It is undisputed that all of Ackerley's signs that are the subject of this litigation are regulated under the terms of one or more of these provisions. Thus, it is also undisputed that as a matter of law ch. 40A, § 6 does not apply to Ackerley's signs.

tively be treated as if the law of prior nonconforming uses applies to them. Accordingly, any alteration of a protected on-premise nonconforming commercial sign that is not "substantially more detrimental than the existing nonconforming use," ch. 40A, Sec. 6, ¶ 1, shall be deemed protected to the same degree as was the sign prior to alteration. Thus, if the sign "Hair Flair by Larry" is replaced by an "Abortion Kills" sign, or the property is sold to Brigham's which replaces the sign with a "Brigham's Ice Cream" sign, the alterations will be protected from the effects of the Ordinance on other nonconforming signs so long as the changes are not substantially more detrimental to the neighborhood.[15]

The determination of whether the alterations are protected will have to be made on a case by case basis. *Powers v. Building Inspector of Barnstable*, 363 Mass. 648, 653, 653–58, 296 N.E.2d 491 (1973) ("rule of law governing nonconforming uses [is applied] on a case by case basis, with the result depending almost entirely on the particular facts of each case") (collecting cases that have upheld and those that have limited nonconforming uses). However, it should be observed that the fact that "Hair Flair By Larry" is a neon sign and its replacements may be made of a different material will presumably be viewed as irrelevant so long as the replacements are of a size commensurate with the prior nonconforming use, and their "use is [not] different in kind in its effect on the neighborhood." *Id.*

### (iii) Ackerley's Response

But for the final revision of Section 10.7, proposed in May 1986 by Mayor Brune, and enacted by the City in July 1986, the actual impact of the Ordinance upon noncommercial signs would have been far less severe. Had the September 1985 revision of Section 10.7 been enacted, Ackerley would have been allowed to maintain such existing, nonconforming billboards as were used to present noncommercial messages or on-premise commercial messages. The relative proportion of noncommercial messages to commercial messages appearing on a routine basis on nonconforming signs in Somerville would have been vastly greater than it will be under the revised Article 10 which was ultimately enacted.

Since the passage of the challenged Ordinance, Ackerley has substantially increased the noncommercial use of its billboards. Ackerley's billboards are now used almost exclusively to deliver noncommercial messages.[16]

Ackerley's motive for transforming and offering to transform all its billboards to noncommercial uses since the 1986 enactment is not necessarily the emergence of a broader interest in asserting noncommercial positions. The cost of tearing down existing structures would be substantial. Ackerley saves dismantling costs by transforming its inventory to noncommercial messages. In addition, the transformation to an inventory of predominantly noncommercial messages provides a positive public relations statement in a hostile political environment. Finally, changing the temporary mix of messages in Ackerley's Somerville billboard inventory is a hedge against the prospect that future judicial or legislative developments will again permit use of those billboards which remain in place with noncommercial messages—even if not covered by the grandfather provision—for the continued delivery of noncommercial and, perhaps at some point, commercial messages.

Whatever Ackerley's motives in choosing to respond to Somerville's regulatory scheme with a policy of increased noncommercial billboard use, I find that implemen-

---

**15.** If the transformation of a sign is not the result of a voluntary decision to alter the sign's content, however, but rather is caused by damage or destruction, it would be governed by Section 10.7.4 which limits reconstruction of nonconforming signs.

**16.** These messages have included: "Say No To Drugs"; "Lend a hand! A friendly act is rarely forgotten"; "Good people are going to prison"; "Rumors are spreading faster than AIDS"; "DO YOU HAVE A HEART? Become an organ donor"; "When the elderly become blind, hardly anyone sees them"; "Please, my little girl needs blood"; "Help us win the fight. Keep America Straight"; "No One Should Be Left Out In the Cold."

tation of revised Article 10 will substantially reduce the use of signs to deliver noncommercial messages in Somerville. This reduction will include not merely the 15% of Ackerley's billboard inventory which customarily was devoted to noncommercial messages but also the increased proportion of noncommercial billboards generated by Ackerley's recent response to Somerville's regulatory efforts.

## II.  CONCLUSIONS OF LAW—CONSTITUTIONAL CLAIMS

Ackerley's attack on the 1986 version of Article 10 is framed broadly and invokes a wide range of federal constitutional constraints upon state regulation.

A.  From the perspective of the First Amendment, Ackerley contends that Section 10.7.1 is unconstitutional because the operation of the exemptive provision affords commercial speech greater protection than noncommercial speech. Further, Ackerley contends that even if treated as regulation of commercial speech, the 1986 revised sign ordinance is unconstitutional under the First Amendment.[17]

B.  From the perspective of Article I and the Due Process Clause of the Fourteenth Amendment of the Constitution, Ackerley contends that even if valid as a First Amendment matter, Section 10 is an invalid *ex post facto* law or an improper retroactive enactment.

C.  From a different perspective on the Due Process Clause of the Fourteenth Amendment, Ackerley contends Section 10 constitutes a regulatory taking of Ackerley's billboards for which just compensation is required.

I address these contentions in turn.

A.  *First Amendment Claims*

The first order of business in addressing Ackerley's First Amendment claims is to determine what type of regulation of speech is implicated by Article 10. First Amendment law establishes two basic tracks for review of restrictions on speech. Professor Tribe describes these two tracks as generated respectively by "government actions *aimed at communicative impact*" or by "government actions *aimed at noncommunicative impact* but nonetheless having adverse effects on communicative opportunity." L.Tribe, American Constitutional Law (2d ed. 1988) 790 (emphasis in original).

Judicial hospitality to regulation involving impact on communicative activity differs substantially depending upon whether the regulation falls onto track one and is termed "content-based" or onto track two and is termed "content-neutral." The First Circuit has observed that "if the government seeks to regulate speech on the basis of content, it must, of course, meet a much more exacting standard than would be the case if only time, place, or manner were implicated." *Matthews v. Town of Needham*, 764 F.2d 58, 60 (1st Cir.1985). This is because

> 'above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its *content.*' ... A restriction, however, on the 'time, place, and manner' of speech is permissible if it advances a significant governmental interest, is justified without reference to the content of the speech, and leaves open 'ample alternative channels for communication of the information.'

*Id.* at 59 (citations omitted) (emphasis in original).

But the forceful statement in *Matthews* that government has no power to restrict expression because of "its message, its ideas, its subject matter, or its content" is overbroad. Commercial speech, for exam-

---

17.  Certain varieties of First Amendment challenge have been waived expressly by Ackerley. For example, the issue of who decides what is commercial and what is noncommercial and the possibility of an official's abuse of discretion —the principal reason the 1977 ordinance was struck down—was not pressed by Ackerley here. In addition, Ackerley has abandoned its contention that enforcement of the regulation will involve an equal protection dimension to its claim of First Amendment violation.

plè, communicates content; however, the message, ideas and subject matter of commercial speech may be restricted under certain circumstances. In this case the distinction between commercial speech and noncommercial speech is critical to a determination whether the regulation of the content of the speech is permissible. Thus, in addressing the impact of the regulation it is important not merely to ask whether revised Article 10 addresses the content of speech, but also what type of speech is affected and how.

    1.  How, if at all, Does Article 10 Turn on the Content of the Speech Regulated?

Determining whether Article 10 is a permissible content-based regulation involves analysis of the regulation from three different perspectives. First, the regulation will be examined on its face. Second, the actual effect of the ordinance upon different forms of communicative activity will be examined. Third, what may broadly be called the intent in enacting the regulation will be examined.[18]

### a. *On Its Face*

■ The protections of Section 10.7.1 for nonconforming signs are determined with reference to the content of the signs. Any sign which "advertises, or promotes the sale of goods, products, or services not sold, provided, or manufactured upon the same premises on which the sign is located," is barred; other signs are not. Thus, the provision on its face directs itself to the message the signs seek to communicate: off-premise commercial information. At first blush, the regulation appears to be plainly content-based. But the content specifically burdened on the face of Section 10.7.1 is a form of commercial speech. And burdens on that form of commercial speech are not the type of content regulation which the courts have found beyond the power of municipalities.[19]

The First Amendment "accords less protection to commercial speech than to other constitutionally safeguarded forms of expression." *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 64–65, 103 S.Ct. 2875, 2879, 77 L.Ed.2d 469 (1983). In this connection a deferential approach to regulation of off-premise signs with commercial content was established in the Supreme Court's last major treatment of "the law of billboards." *Metromedia, Inc. v. San Diego*, 453 U.S. 490, 501, 101 S.Ct. 2882, 2889, 69 L.Ed.2d 800 (1981).

**18.** In order fully to develop the record in this case, I have undertaken to find facts with respect to the actual impact of the enforcement of the Article and with respect to Somerville's intent in enacting the current version of Article 10. There is a dispute between the parties regarding the propriety and the implications of such findings. I will explore those issues more fully in the following discussion of my legal conclusions. I recognize that these are areas in which the law is unsettled. The findings are made, however, in order to permit any reviewing court to adjust my conclusions on the basis of a full explication of the facts.

**19.** It should be noted that recent developments in the Supreme Court's analysis of the distinction between "content-neutral" and "content-based" restrictions on speech, suggest that Section 10.7 may be treated facially as "content-neutral." *See Boos v. Barry*, —— U.S. ——, 108 S.Ct. 1157, 1163–64, 99 L.Ed.2d 333 (1988).

In *Boos*, the Supreme Court reaffirmed the analysis first developed in *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) and defined "'content-neutral' speech restrictions as those that 'are *justified* without reference to the content of the regulated speech.'" 108 S.Ct. at 1163 (emphasis in original). The Court maintained that "[s]o long as the justifications for regulation have nothing to do with content ... the regulation [is] properly analyzed as content-neutral." *Id.*

In the instant case, the facial justifications for the Somerville Ordinance—*see* Section 10.1 of the Ordinance—are wholly unrelated to the content-based distinction that also appears on the face of the Ordinance. Thus, under *Boos* and *Renton* it may be appropriate to analyse the Ordinance on its face as a "mere" place and manner restriction on speech. I have chosen not to address this developing First Amendment approach in my facial perspective on revised Article 10 because its parameters are not yet clear. *See Boos*, 108 S.Ct. at 1172 (Brennan, J., concurring) ("*Renton* itself seemed to confine its application to 'businesses that purvey sexually explicit materials'"); L. Tribe, *American Constitutional Law* (2d ed. 1988) 798 n. 17. (*Renton* represents an "ill-advised dimension to the determination of whether a restriction is based on 'content.'") The *Boos/Renton* approach is, however, squarely addressed from the perspective of intent in Section II.A.1.C, *infra*.

The Court in *Metromedia* found the regulation of off-premise commercial speech justifiable but went on to conclude that because the regulation there also burdened all noncommercial billboard speech the San Diego ordinance was unconstitutional. The *Metromedia* judgment was "based essentially on the inclusion of noncommercial speech within the prohibitions of the ordinance," *id.* 453 U.S. at 522 n. 26, 101 S.Ct. at 2900 n. 26, *i.e.* on the plurality's assessment that the ordinance favored commercial over noncommercial speech. This position commanded a majority of the Court as evidenced by Justice Brennan's separate opinion in *Metromedia*. *See also Georgia Outdoor Advertising, Inc. v. The City of Waynesville*, 833 F.2d 43, 46 n. 6 (4th Cir. 1987); *Matthews*, 764 F.2d at 61 (a bylaw that gives more protection to commercial than to noncommercial speech "inverts a well-established constitutional principle").

On its face, Section 10.7.1 applies evenhandedly between noncommercial and commercial speech. The parties agree the exemptive section would allow a nonconforming noncommercial sign to be displayed at a restaurant just as it would permit the restaurant to display a nonconforming commercial sign advertising its bill of fare. Indeed, on the face of revised Article 10, noncommercial signs appear to have an advantage over commercial signs. Nonconforming off-premise signs which have consistently contained noncommercial messages since July 28, 1985 are not subject to removal while nonconforming off-premise signs which have carried commercial messages must be removed.

Article 10 is thus distinguishable on its face from the provision found unconstitutional by the Supreme Court in *Metromedia*. The San Diego ordinance in *Metromedia* permitted on-premise commercial advertising, but prohibited noncommercial advertising everywhere. The Court found that San Diego could not hold its official interests in aesthetics and safety as less deserving of protection than private interests in commercial on-premise communications, without affording at least the same degree of protection to private interests in noncommercial communications. *See Me-*

*tromedia*, 453 U.S. at 521, 101 S.Ct. at 2899–2900. Implicit in the Court's findings, was the premise that if San Diego had treated commercial and noncommercial private interests equally, then its ordinance would have withstood Metromedia's challenge.

Here Somerville has made the determination in Section 10.7 that its official interest in aesthetics is not as strong as either private interests in on-premise commercial communication or private interests in noncommercial communications anywhere. Hence, Section 10.7.1 is distinguishable from the unconstitutional San Diego ordinance struck down in *Metromedia*.

For the same reason, Section 10.7.1 may also be distinguished from the ordinances found unconstitutional by the First Circuit in *John Donnelly & Sons v. Campbell*, 639 F.2d 6 (1st Cir.1980), *aff'd*, 453 U.S. 916, 101 S.Ct. 3151, 69 L.Ed.2d 999 (1981) and *Matthews v. Town of Needham, supra.*

The Maine statutory sign and billboard regulations struck down in *John Donnelly & Sons*, made accommodation for on-premise commercial advertising but did not make this on-premise exception available for "[m]essages such as 'Abortion is Murder,' 'Save the Whales,' 'No Nukes,' and 'Contribute to your Community Fund,'" which were "altogether banned." 639 F.2d at 15. As a consequence of this facially disparate treatment of commercial and noncommercial (or, in the court's term, "ideological") speech—an inequity that the court characterized as "a peculiar inversion of First Amendment values"—the First Circuit found itself "obliged to hold the statute unconstitutional." *Id.* at 16.

The Town of Needham Sign By-law struck down in *Matthews*, permitted various commercial exceptions to its general prohibition on outdoor signs in the Town, but did not make the exceptions available to "political signs." As a result, the First Circuit found that the by-law was "concerned with the content, as opposed to the time, place, or manner, of the speech" and that it failed to meet the "much more exacting standard [of review for content-

based restrictions upon speech] than would be the case if only time, place, or manner were implicated." *Id.* at 60.

In contrast to the Maine statute and the Town of Needham By-law found unconstitutional by the First Circuit, the Somerville Ordinance at issue here shows no preference on its face for commercial speech as against noncommercial speech. It does not invert traditional First Amendment values. The structure of Article 10's exemptions facially burden commercial speech more heavily than speech delivering noncommercial, ideological and political messages. The Somerville Ordinance is, in this respect, quite similar to the sign ordinances which recently withstood First Amendment constitutional challenges in the Fourth and Sixth Circuits. *See Georgia Outdoor Advertising, Inc.*, 833 F.2d at 46 ("crucial" feature of challenged ordinance that protected it from successful constitutional challenge is provision that all authorized nonconforming signs are permitted " '. . . to contain non-commercial copy in lieu of other copy' "); *Wheeler v. Commissioner of Highways, Commonwealth of Kentucky*, 822 F.2d 586, 593 (6th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 702, 98 L.Ed.2d 653 (1988) ("Unlike the restriction at issue in *Metromedia*, the on-premises exception in the present case is not limited to commercial speech: the on-site exception can be applied to any topic, commercial or non-commercial . . ."). *See also Rzadkowolski v. Village of Lake Orion*, 845 F.2d 653 (6th Cir.1988).

Like the ordinances found constitutional by the Fourth and Sixth Circuits, the Somerville Ordinance on its face permits any noncommercial message to be placed on an on-premise nonconforming sign, thereby removing the preference toward commercial speech that was fatal to the San Diego ordinance in *Metromedia*, the Maine statute in *John Donnelly & Sons*, and the Needham by-law in *Matthews*.

### b. *By its Impact*

█ What the Somerville Ordinance provides on its face, and what its actual effect will be, I have found to be different phenomena. On its face, the Somerville Ordi-

nance, if it shows any preference, shows a preference for noncommercial speech. However, there can be no dispute that the impact of revised Article 10 upon noncommercial speech will, at least for the short term, be proportionately far more burdensome than its impact upon commercial speech. Although facially distinguishable from the regulations struck down in *Metromedia, Donnelly*, and *Matthews*, the Somerville ordinance appears initially to have precisely the same *de facto* effect upon preferred noncommercial speech as the provisions at issue in those cases had *de jure.*

In light of the disparate impact that enforcement of the revised Ordinance is bound to have upon noncommercial speech, Ackerley argues that it would elevate form over substance to insulate Article 10 from successful constitutional challenge. There is some recent support for this argument. *See Jackson v. City of Charlottesville*, 659 F.Supp. 470 (W.D.Va.1987), *aff'd in part on other grounds, vacated in part on other grounds*, 840 F.2d 10 (4th Cir.1988).

In *Jackson*, the court considered a constitutional challenge to a zoning ordinance which prohibited " '(a)ny sign which advertises any activity, business, product or service which is not conducted, produced or sold on the premises where the sign is located.' " *Id.* at 471. The court noted that "[o]f course, signs advertising noncommercial activities which are conducted on-premises are permitted under the language of § 31–182(e) [the ordinance] itself." *Id.* at 471 n. 1. Nevertheless, the court held the ordinance unconstitutional because it found that

[w]hile the ordinance in *Metromedia* differs somewhat in form from the local ordinance challenged in this case, a careful analysis of the two ordinances shows that each reaches the same result, i.e. the virtual prohibition of non-commercial advertising and off-premises commercial advertising. . . . [I]t is inescapable that the Charlottesville sign ordinance virtually prohibits non-commercial advertising and off-premises commercial advertising, while permitting on-premises commercial

advertising. As such, the sign ordinance effectively affords greater protection to commercial speech than non-commercial speech, and thereby runs afoul of the plurality's analysis and ruling in *Metromedia.*

*Id.* at 473 n. 3 and 473. *See also Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 71 n. 35, 96 S.Ct. 2440, 2453 n. 35, 49 L.Ed.2d 310 (1976) (cautioning against the enactment of zoning regulations that have "the *effect* of suppressing, or greatly restricting access to, lawful speech") (emphasis supplied); *Donnelly & Sons v. Campbell,* 639 F.2d at 16 (statute is struck down because its "impositions are both legally and *practically* the most burdensome on ideological speech") (emphasis supplied).

To the degree *Jackson* may be applicable here, I do not find it persuasive. The effect of revised Article 10 is not itself the result of Somerville's action. Rather the impact is a function of the ways in which those who use signs choose or have chosen to employ that medium. Of course, the use of on-premise nonconforming signs for non-commercial speech is improbable. As Justice Stevens observed in his *Metromedia* dissent,

> It is conceivable that some public-spirited or eccentric businessman might want to use a permanent sign on his commercial property to display a noncommercial message. The record, however, discloses no such use in the past, and it seems safe to assume that such uses in the future will be at best infrequent.

453 U.S. at 545 (Stevens, J., dissenting in part).

But First Amendment law requires only that Somerville provide equal opportunity for the expression of noncommercial and commercial messages; it does not require equal results. Insofar as I have found that the challenged ordinance provides an opportunity for on-premise noncommercial signs, it is constitutionally irrelevant that those signs are—as a practical matter—unlikely to become media for noncommercial messages.

■ The constitutional command is that government permit noncommercial speech to compete on at least an equal basis with commercial speech not that government guarantee equality or otherwise underwrite the competition. Revised Article 10 permits noncommercial signs to the same, if not a greater, degree than it permits commercial signs. If such permission does not result in noncommercial use of the grandfathered nonconforming signs, that will be a function of private choice. And that is not a result for which Somerville may be held responsible. As the Fourth Circuit explained in *Georgia Outdoor Advertising,* "the possibility that owners of on-premise signs [will] not allow their signs to be used for non-commercial messages [is] not constitutionally significant, since that [will] 'derive from the decisions of the individual property owners ... (and not) the ... ordinance itself.'" *Georgia Outdoor Advertising,* 833 F.2d at 46, *quoting Major Media of the Southeast, Inc. v. City of Raleigh,* 792 F.2d 1269, 1273 (4th Cir.1986), *cert. denied,* 479 U.S. 1102, 107 S.Ct. 1334, 94 L.Ed.2d 185 (1987).

### c. *In its Motivation*

■ The Supreme Court has this term reaffirmed that a regulatory provision should be viewed as content neutral, "[s]o long as the justifications for regulation have nothing to do with content, ... [i.e. so long as a] regulation targets [not] a particular category of speech, [but] a secondary feature that happens to be associated with that type of speech." *Boos v. Barry,* 108 S.Ct. at 1163.

This mode of analysis in *Boos* was drawn from a recent approach to the question whether an enactment restricting speech through zoning regulation was content based. *See* note [19] *supra.* That approach was outlined in *City of Renton v. Playtime Theaters Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), where the Supreme Court directed that inquiry be made regarding the "'*predominate* concerns'" of the enacting body. *Id.* 106 S.Ct. at 929 (emphasis in original).

*Renton* involved a challenge to a city ordinance which prohibited "adult motion picture theaters from locating within 1,000

feet of any residential zone, single- or multiple-family dwelling, church, park, or school." *Id.* at 926. Justice Rehnquist, in an opinion joined by five other members of the Court observed that "[t]o be sure, the ordinance treats theaters that specialize in adult films differently from other kinds of theaters. Nevertheless, ... the Renton ordinance is completely consistent with our definition of 'content-neutral' speech regulations as those that 'are *justified* without reference to the content of the regulated speech.'" *Id.* at 929 (emphasis in original) (citations omitted).

The *Renton* Court found that the "ordinance is aimed not at the *content* of the films shown at 'adult motion picture theatres,' but rather at the *secondary effects* of such theaters on the surrounding community ... [and] that the City Council's '*predominate* concerns' were with the secondary effects of adult theaters, and not with the content of adult films themselves." *Id.* at 929 (emphasis in original). On this basis, the Court held that "[t]he ordinance does not contravene the fundamental principle that underlies our concern about 'content-based' speech regulations: that 'government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views.'" *Id.* (citation omitted).

I find the *Renton* emphasis on predominate concern to be a helpful means of approaching the somewhat uncertain considerations which surround the problem of analyzing intent, purpose or motive in First Amendment litigation. Despite broad pronouncements in *United States v. O'Brien*, 391 U.S. 367, 382–385, 88 S.Ct. 1673, 1681–84, 20 L.Ed.2d 672 (1968) that the constitutionality of First Amendment regulation is in no way dependent upon the intent, purpose or motive that led to its enactment, it is clear that those factors have remained relevant considerations in constitutional adjudication. This is particularly true in settings other than pure free speech litigation. *See, e.g., Edwards v. Aguillard*, —— U.S. ——, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (establishment clause); *Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) (voting rights under Fourteenth and Fifteenth Amendment); *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (equal protection).

*Renton* suggests that courts must also ascertain the "predominate concern" of the government in enacting a regulation infringing upon free speech. Indeed, in this case, where the defendants have justified the Ordinance as serving an aesthetic purpose, it is especially incumbent upon me to examine the City's alleged ulterior motive. As the Supreme Court plurality observed in *Metromedia*, 453 U.S. at 510, 101 S.Ct. at 2893–94, "esthetic judgments are necessarily subjective, defying objective evaluation, and for that reason must be carefully scrutinized to determine if they are only a public rationalization of an impermissible purpose."

Ackerley contends that the combination of Mayor Brune's knowledge and the timing of his proposed revision—just three weeks after the final negotiation session between Somerville and Ackerley—leads inescapably to the conclusion that in proposing and then enacting the revision, Somerville was *motivated* and acted with the specific intent to prevent Ackerley from using its billboards for noncommercial purposes.

Somerville disputes the contention that it acted with an improper motive in enacting the revised sign Ordinance. It asserts that it did not intend by the one-year language in Section 10.7.1 to suppress noncommercial messages. Somerville claims that at most the evidence reflects a concern by the City that Ackerley might try to exploit the exemptive relief in Section 10.7, which had originally been included to give protection to established sign usage for noncommercial speech. The City perceived an effort by Ackerley to protect its unsightly billboard structures by trying to convert them to noncommercial speech irrespective of their customary past usage for the display of commercial messages. Somerville contends that the true motivation for the change was simply to close a glaring "loophole" in the original proposal which would

have prevented full effectuation of the aesthetic purposes of the Ordinance.

I have concluded that Mayor Brune's motive [20] in revising the originally proposed Ordinance and the Somerville City Counsel's motive in adopting the Mayor's revised proposal were not constitutionally improper. In arriving at this conclusion, I have, of course, carefully evaluated the credibility, in light of all the evidence, of Mayor Brune and his aides by assessing the substance of their trial testimony as well as their demeanor in the court. When Mayor Brune revised his initially proposed Ordinance, he was not motivated by any animus toward the messages, topics or subject matter delivered from Ackerley's billboard structures—whether noncommercial or commercial. Rather he was animated by a desire to eliminate as many billboard structures from Somerville as could be done, while leaving numerous on-premise commercial signs unaffected. His sole purpose and predominate concern was, in fact, the constitutionally valid one of wanting to close what he had come to realize was the potential for underinclusiveness in the regulatory scheme for eliminating billboards from his city.

■ Of course, I have also found the Mayor recognized that the likely effect of the revision would be to eliminate a substantial number of billboards which would be used in the future for noncommercial purposes, and to decrease substantially the proportion of noncommercial as opposed to commercial signs in Somerville. However, knowledge of a likely secondary effect of a public action may not be equated with a predominate concern to bring about that particular effect.

In making my determination that the defendant's intent in adopting Article 10 was not unconstitutional, I have found particularly useful the three factors identified by the District of Columbia Circuit as relevant to the determination of whether facially neutral restrictions on speech "mask constitutionally improper motives." *White House Vigil for the ERA Committee* [1] *v. Clark,* 746 F.2d 1518, 1536 (D.C.Cir.1984). The three factors are the following:

i. Whether "the government can prove [that it] has regulated for the benefit of the *public* rather than for the promotion of its own aesthetic preferences." On this factor "the government must show that the regulation was enacted for purposes other than the effectuation of its drafters' personal tastes." *Id.* at 1536 (emphasis in original).

Somerville's generalized public concern with the offensiveness of billboard structures is apparent. It has been informed by the views of planning professionals. The lack of any opposition, save that of Ackerley, bespeaks settled community views favoring the aesthetic preference of revised Article 10. It does not merely reflect the views of Mayor Brune, although he has been a leader in this area.

ii. "[T]he *extent* to which it burdens speech." On this factor, "[t]he more restrictive an aesthetic regulation, the closer a court must look to determine if it is based on constitutionally improper motives." *Id.* at 1537 (emphasis in original).

The breadth of the restrictions imposed by revised Article 10 will be explored more closely in the discussion of time, place and manner restrictions. Let it suffice for the moment that a searching inquiry has disclosed no constitutionally improper motive in the enactment of Section 10.7 as revised.

iii. Whether the challenged regulation is merely "an *isolated* attempt to regulate ... aesthetics," or part of an ongoing and genuine aesthetic purpose. On this factor, if it is found to be an isolated effort, the court will have to engage "in a more searching inquiry to ensure that the agency has regulated for genuinely aesthetic reasons and not for the purpose of curtailing protected expression." *Id.* at 1538 (emphasis in original).

---

**20.** I have anthropomorphized the City's intent by ascribing it to Mayor Brune. This is not a circumstance in which there is some difficulty in discerning the intent of a body which has a number of different decision makers. Mayor Brune, in this circumstance, acted to effect a public policy shared by all the decision makers in Somerville. It is fair, therefore, to speak of Mayor Brune's motive as being indistinguishable from that of the City itself.

Somerville's concerns with the aesthetic dimension to signs generally and billboards in particular are long standing. The City's systematic and professional approach to planning evidenced by its use of outside planners and advisers attests to an integrated effort to make billboard regulation an aspect of its larger aesthetic policy. This approach to billboard regulation is indifferent to the content of any expression which might be curtailed.

### d. Conclusion

The permissible facial distinctions between commercial and noncommercial speech made in the exemptive section of revised Article 10 are not rendered impermissible by either a disproportionately adverse impact upon Ackerley's noncommercial speech or a constitutionally improper motive on the part of Somerville to select the particular messages the public may hear. Revised Article 10, accordingly, may be treated as a "content-neutral" enactment, as the relevant case law has come to define that term. I, therefore, turn to inquire whether revised Article 10 constitutes a proper time, place and manner restriction on speech.

### 2. Is Article 10 Valid Time, Place and Manner Regulation?

A challenge to an ordinance on the ground that it unconstitutionally impedes the time, place and manner of non-commercial speech may be reviewed under the three-part test recently recognized in *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984): [21]

Expression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, and manner restric-

tions.... [R]estrictions of this kind are valid provided that they are [1] justified without reference to the content of the regulated speech, [2] that they are narrowly tailored to serve a significant governmental interest, and [3] that they leave open ample alternative channels for communication of the information.

I have treated at length in Section II.A.1 *supra,* the first issue, whether revised Article 10 can properly be treated as justified without reference to the content of the regulated speech; and I have concluded that it may. I turn to the remaining factors, the question of narrow tailoring to advance significant governmental interests and the question of alternative channels of communication.

### a. Significance of the Governmental Interests and Narrowness of the Tailoring

There is no real controversy regarding the significance of the interest of Somerville—and other communities—in advancing aesthetic concerns by regulating billboards. In *Metromedia,* there was no dispute concerning the proposition that "[i]t is not speculative to recognize that billboards by their very nature, wherever located and however constructed, can be perceived as an 'aesthetic harm.'" 453 U.S. at 510, 101 S.Ct. at 2893–94. The principal stated purpose of revised Article 10—to enhance the aesthetic appearance of the city—was held in *Metromedia* to be "sufficiently substantial to provide an acceptable justification for a content-neutral prohibition against the use of billboards." *City Council of Los Angeles v. Vincent,* 466 U.S. 789, 807, 104 S.Ct. 2118, 2130, 80 L.Ed.2d 772 (1984).

In addition to the stated purpose, another obvious aim of the revised Article 10 is to

---

**21.** In *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 298 & n. 8, 104 S.Ct. 3065, 3071 n. 8, 82 L.Ed.2d 221 (1984), the Supreme Court appeared effectively to conflate the tests for time, place, and manner restrictions with the four part analysis regarding expressive conduct set out in *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968):

[A] government regulation is sufficiently justified [1] if it is within the constitutional power of the Government; [2] if it furthers an im-

portant or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. Although the parties have used the *O'Brien* formulation in arguing their respective positions, the *Clark* formulation—which is not materially different—appears to frame the issues more appropriately.

enable occupants of local property to advertise the purposes for which they are using their premises. This aim was also recognized as substantial in *Metromedia*, 453 U.S. at 512, 101 S.Ct. at 2894–95, where the Court accepted the proposition that a city's interest in aesthetics could yield to "onsite commercial [and, *a fortiori*, noncommercial] advertising." The court observed that a

> city could reasonably conclude that a commercial enterprise—as well as the interested public—has a stronger interest in identifying its place of business and advertising the products or services available there than it has in using or leasing its available space for the purpose of advertising commercial enterprises located elsewhere.

*Id. Cf. Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 116, 69 S.Ct. 463, 468, 93 L.Ed. 533 (1949) (Jackson, J., concurring) ("there is a real difference between doing in self-interest and doing for hire, so that it is one thing to tolerate action from those who act on their own and it is another thing to permit the same action to be promoted for a price").

The substantial and important interests being advanced by the challenged revision to Article 10 are Somerville's interest in reducing visual clutter and its interest in enabling those using property in Somerville to engage in onsite promotion of their businesses.

The answer to the question whether there is narrow tailoring follows from identification of the interests being advanced. The Supreme Court has very recently observed that "[a] statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, —— U.S. ——, ——, 108 S.Ct. 2495, 2502, 101 L.Ed.2d 420 (1988). In the case of billboards "the substantive evil—visual blight—is not merely a possible by-product of the activity, but is created by the medium of expression itself." *City Council of Los Angeles v. Vincent*, 466 U.S. at 810, 104 S.Ct. at 2131–32. Thus "[a] complete ban [on a medium of communication] can be narrowly tailored, but only if each activity within the proscription's scope is an appropriately targeted evil." *Frisby v. Schultz*, —— U.S. at ——, 108 S.Ct. at 2502–03. Consequently, in *Vincent* the Supreme Court "upheld an ordinance that banned all signs on public property because the interest supporting the regulation, an aesthetic interest in avoiding visual clutter and blight, rendered each sign an evil." *Id.*

I am, of course, sensitive to the fallacy of the " 'greater-includes-the-lesser' syllogism" identified by Justice Brennan in *City of Lakewood v. Plain Dealer Publishing Co.*, —— U.S. ——, ——, 108 S.Ct. 2138, 2146–52, 100 L.Ed.2d 771 (1988). There can be, as Justice Brennan observes, "radically different constitutional harms inherent in the 'greater' and 'lesser' restrictions." *Id.* —— U.S. at ——, 108 S.Ct. at 2147. Courts must be alive to the potential for censorship which the lesser restriction of an incomplete ban on a medium might afford. "This danger is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official," *id.* —— U.S. at ——, 108 S.Ct. at 2147, as it was in *City of Lakewood.*

But in the absence of a danger of censorship, the legislative decision to address only a portion of the problem posed by a medium otherwise subject to a total ban, does not create a presumption of unconstitutionality merely because it may be analogized to the "greater-includes-the-lesser" fallacy. As a general proposition governmental entities are afforded the discretion to undertake piecemeal reform. "Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think.... [T]he reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Williamson v. Lee Optical*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed.2d 563 (1955). *Cf. Railway Express*, 336 U.S. at 110, 69 S.Ct. at 465–66 ("It is no requirement of equal protection that all evils of the same genus be eradicated or none at all").

I have already concluded that revised Article 10 is not content or viewpoint based. Consequently, the lesser included prohibitions of a partial ban on signs directed principally to billboard structures can be analyzed at this point, faithfully to the spirit of *City of Lakewood*, solely with reference to the relative practical success of Somerville in achieving its limited goal.

Ackerley attacks Somerville's efforts in this regard through revised Article 10 by contending that it is not the least restrictive means to advance Somerville's aesthetic interests. But even if true, this contention misses the mark

> Narrowly tailoring a regulation as a means to a substantial governmental end does not entail selecting the least restrictive means for achieving the end. 'The least-restrictive-alternative analysis invoked by [plaintiff] has never been a part of the inquiry into the validity of a time, place, and manner regulation. It is enough that the ... restriction substantially serves the Government's legitimate ends.'

*Craft v. Hodel*, 683 F.Supp. 289, 294 (D.Mass.1988), *quoting Regan v. Time, Inc.*, 468 U.S. 641, 657, 104 S.Ct. 3262, 3271, 82 L.Ed.2d 487 (1984) (plurality). Each of the less restrictive alternatives identified by Ackerley is less restrictive in direct proportion to its inability to eliminate certain of the sources of the evil—billboard structures—which are the precise target of the Somerville ordinance.[22]

### b. *Alternative Channels of Communication*

Even conceding that Somerville has effectively foreclosed billboards as a medium of communication in Somerville, it is apparent that there are more than adequate alternative means of conveying the messages which those billboards previously conveyed.

There is nothing in the record to suggest that a medium uniquely designed to permit dissemination of the concerns of the otherwise disenfranchised have been foreclosed by an effective ban on billboards. *Compare* Lee, *Lonely Pamphleteers, Little People, and the Supreme Court: The Doctrine of Time, Place and Manner Regulations of Expression*, 54 Geo. Wash. L.Rev.

22. For example, in argument, Ackerley maintained that if instead of Section 10.7, Somerville had passed an ordinance banning all sign structures over 65′ in height, it would have eliminated essentially the same number of signs as will be eliminated by the present Ordinance, and it would have done so in a manner demonstrably less intrusive of protected noncommercial expression. Ackerley maintains that if enforced, the current Ordinance will eliminate 100% of Ackerley's Somerville billboards and no on-premise commercial signs. By contrast, according to Ackerley, the effect of its proposed "less restrictive" ordinance would be to eliminate 90% of Ackerley's billboards and ten on-premise commercial signs. Insofar as the 10% of Ackerley's billboards that would be left in place by Ackerley's proposed alternative ordinance would be used (indeed, could be required) to carry noncommercial messages, Ackerley contends that Section 10.7 unnecessarily disfavors noncommercial speech.

It is possible that Ackerley's argument would be persuasive if the only interest served by the Ordinance were the aesthetic one. In such a case, Ackerley's proposed alternative might be seen as serving Somerville's interest nearly as efficiently as the enacted Ordinance, while at the same time being somewhat less restrictive of protected expression. However, the aesthetic interest is not the only interest served by the

enacted Ordinance. A substantial and legitimate interest in on-premise advertising is also served by revised Article 10. Ackerley's proposed alternative would not protect this interest nearly as efficiently; indeed, Ackerley's proposal would undercut this interest by requiring the removal of ten on-premise commercial signs. Ackerley's proposal would be less restrictive of Ackerley's billboards and the protected noncommercial messages that Ackerley represents it would convey from those billboards; however, it would not advance, indeed, it would retard, Somerville's substantial and legitimate interest in leaving on-premise advertising undisturbed. Revised Article 10 serves this latter interest, while at the same time advancing Somerville's interest in reducing visual pollution. In doing so, revised Article 10 may restrict a medium for protected speech. However, it is not unnecessarily restrictive. It is narrowly tailored to serve the substantial and legitimate purposes underlying its enactment.

> The city has gone no further than necessary in seeking to meet its ends. Indeed, it has stopped short of fully accomplishing its ends: It has not prohibited all billboards, but allows onsite [commercial and noncommercial] advertising and some other specifically exempted [off-premise noncommercial] signs.

*Metromedia*, 453 U.S. at 508, 101 S.Ct. at 2892–93.

757 (1986). An examination of the messages which Ackerley suggests will now no longer be delivered by billboards indicates concerns at a fairly high level of generality and a fairly low level of controversy regarding matters more than adequately discussed in the national, regional and local press and broadcast media.

In addition, of course, revised Article 10 also holds out the possibility that commercial on-premise signs will be transformed into noncommercial signs. While I find such transformations improbable, the theoretical potential that they may occur serves to emphasize a more fundamental point: that permissible nonconforming signs are not attractive candidates for noncommercial messages is merely a reflection of the allocation of resources in the market place of ideas. Alternative channels of communication to Ackerley's billboards remain available, however, to those who choose to use them.

### 3. Is Article 10 a Valid Regulation of Commercial Speech?

The test for evaluating the validity of commercial speech regulation is largely a reformulation of the second and third prongs of the time, place and manner test set out in *Clark*.

As the Court in *Metromedia* observed: A restriction on otherwise protected commercial speech is valid only if it [a] seeks to implement a substantial governmental interest, [b] directly advances that interest, and [c] reaches no further than necessary to accomplish the given objective. 453 U.S. at 507, 101 S.Ct. at 2892, *citing Central Hudson Gas and Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 563–566, 100 S.Ct. 2343, 2350–51, 65. L.Ed.2d 341 (1980).

In large measure the *Central Hudson* factors have already been addressed in the discussion of time, place and manner regulation contained in Section II.A.2, *supra.* I pause to address the issue of necessity of

the means chosen to advance the City's concededly substantial interests because Ackerley chooses to attack those means as being other than the "narrowest manner possible." While the "narrowest manner possible" formulation appears to be nothing other than an inapposite application to commercial speech analysis of the discredited "least restrictive means" formulation, its use prompts some further observations.

Ackerley suggests that Somerville did not have a sufficient factual basis for reaching the conclusion that removal of billboards would advance the substantial interest of the city in its appearance. In this connection, Ackerley cites a number of cases where the record was found inadequate to support the government's conclusion that the ordinance enacted would promote the stated interest. *City of Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, 106 S.Ct. 2034, 2038, 90 L.Ed. 2d 480 (1986) (cable television lines); *754 Orange Ave., Inc. v. City of West Haven, Connecticut*, 761 F.2d 105, 112 (2d Cir. 1985) (adult bookstore); *Avalon Cinema Corp. v. Thompson*, 667 F.2d 659, 661–662 (8th Cir.1981) (adult theatre). These cases dealt with problems such as neighborhood denigration that were less obviously solved by regulation of the activity involved.

In this case, unlike *Avalon* or *754 Orange*, "the substantive evil-visual blight—is not merely a possible by-product of the activity, but is created by the medium of expression itself." *Vincent*, 466 U.S. at 810, 104 S.Ct. at 2131.

The evidence here cannot fairly be termed "conclusory." I have found that for almost twenty years in Somerville there has been articulated as an important urban design priority, the regulation and elimination of billboards for the purpose of improving appearance. The record substantiates a continuing, serious and comprehensive concern with the problems raised by billboards.[23] *Metromedia* itself recognized

**23.** Ackerley argues that the speed and apparent lack of deliberation with which the City adopted Mayor Brune's May 8, 1986 proposal suggests that the City did not consider other alternatives.

Ackerley notes that the contemporaneous justifications for revisions to Article 10 were obviously the product of staff work over which little detailed control was exercised by decisionmak-

that bans on billboards are permissible means to advance the interest in solving those problems.

As in *Metromedia*, the Somerville Ordinance here reaches no further than necessary to accomplish the given objective. "If the city has a sufficient basis for believing that billboards ... are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them." 453 U.S. at 508, 101 S.Ct. at 2893.

Thus, as the Supreme Court observed in *Metromedia*, "[W]hether onsite advertising is permitted or not, the prohibition of offsite advertising is directly related to the stated objectives [of revised Article 10]...." *Id.* at 511, 101 S.Ct. at 2894. The Court's observations regarding the tailoring of such ordinances are equally relevant:

This [direct relationship] is not altered by the fact that the ordinance is underinclusive because it permits onsite advertising. [In addition,] the city may believe that offsite advertising, with its periodically changing content, presents a more acute problem than does onsite advertising. See *Railway Express*, 336 U.S. at 110.... [Somerville] has obviously chosen to value one kind of commercial speech—onsite advertising—more than another kind of commercial speech—offsite advertising. The ordinance reflects a decision by the city that the former interest, but not the latter, is stronger than the city's interests in ... aesthetics. The city has decided that in a limited instance—onsite commercial advertising —its interests should yield....

The constitutional problem in this area requires resolution of the conflict between the city's land-use interests and the commercial interests of those seeking to purvey goods and services within the

city. In light of the above analysis, we cannot conclude that the city has drawn an ordinance broader than is necessary to meet its interests, or that it fails directly to advance substantial government interests. In sum, insofar as it regulates commercial speech the [Somerville] ordinance meets the constitutional requirements of *Central Hudson, supra.*

Id. at 511–512, 101 S.Ct. at 2894–95.

4. Does the Temporal Dimension to Revised Article 10 Change The Analysis for First Amendment Purposes?

I have not yet in this analysis isolated the temporal dimension to revised Article 10. To some degree the retrospective aspect of the Ordinance is addressed in Section II.B.2, *infra.* But the decision to weave a ban on billboards whose net extends along a temporal dimension requires that the retrospective quality be addressed as a matter of First Amendment analysis as well.

I have found that the decision to look to the experience for the year preceding enactment of revised Article 10 was intended to ban as many structures as possible. Although unarticulated, it is apparent that this design has a larger policy justification. The City could properly conclude that in order to qualify for exemptive status, an objectionable, nonconforming sign structure should have been used for a protected purpose with some measure of consistency. This is not to suggest that a billboard must have been dedicated from time immemorial to noncommercial speech in order to obtain special protection. Rather it is not unreasonable for the City to reserve special protections only for those structures which had been used in a fashion which indicated a non-transitory commitment to noncommercial messages.

ers. The speed and decisiveness of the decisionmakers and the ease with which staff drafting of the supporting documents could be effected, however, only bespeaks a unanimity of view regarding the appropriateness of the Mayor's proposed manner of dealing with billboards. There is no reason why every legislative enactment must be accompanied by an extended individualized judicial evaluation—such as occurred

in the creation of this Memorandum—in order for it to have procedural validity. It is sufficient that Somerville's decisionmakers did not act arbitrarily and capriciously in following the necessary procedural forms for enactment. Certainly Somerville's attention to these issues for more than the past ten years demonstrates an adequate basis for the legislative judgment made in enacting revised Article 10.

Of course, the choice of the awkward one-year retrospective operative date for revised Article 10, appears to have indirectly effected a virtual ban on billboards. But this is a result that the Supreme Court has accepted when undertaken directly in the name of aesthetic considerations. As Justice White recently observed in counting the votes from *Metromedia*, "[a] majority of this Court found that similar aesthetic considerations would be sufficient to justify a content-neutral ban on all outdoor advertising signs, notwithstanding the extent to which such signs convey First Amendment protected messages." *City of Lakewood*, —— U.S. at ——, 108 S.Ct. at 2157–58 (White, J., dissenting).

Somerville's "content-neutral" regulation of billboards as embodied in revised Article 10 is no less constitutional because it works in a convoluted and oblique manner, through the temporal dimension, to achieve an effective ban on those structures.

### 5. Conclusion

I have analyzed revised Article 10 from a variety of different perspectives in order to determine whether it runs afoul some aspect of First Amendment law. The convoluted and oblique manner by which the regulation works is reminiscent of a Rube Goldberg machine. But it achieves its intended result of drastically limiting the number of billboard structures which may remain in Somerville. I have searched carefully to determine whether revised Article 10 reflects "a law or policy permitting communication in a certain manner for some but not for others," in order to identify what Justice Brennan for the majority in *City of Lakewood* called "the specter of content and viewpoint censorship." —— U.S. at ——, 108 S.Ct. at 2147. I have been unable to discern such a spirit in revised Article 10. Although indirect, the ordinance satisfies the time, place and manner and commercial speech tests applicable to its evaluation. That it functions by reference to a retrospective temporal dimension does not detract from its constitutionality as a matter of First Amendment law. Accordingly, I reject Ackerley's First Amendment challenge to revised Article 10.

### B. *Ex Post Facto and Due Process Claims*

Ackerley contends that Section 10.7 violates the constitution's *Ex Post Facto* Clause, Article I, Sec. 10, as well as the Due Process Clause of the Fourteenth Amendment. Ackerley maintains that Section 10.7 constitutes an *ex post facto* law because it exposes Ackerley to criminal sanctions for having legally displayed commercial messages on its off-premise billboards between July 28, 1985 and July 28, 1986. Section 10.7 is also, according to Ackerley, violative of the Due Process Clause because it imposes harsh and oppressive civil penalties for this same lawful use by Ackerley of its Somerville billboards in the period between July 28, 1985 and July 28, 1986.

Ackerley contends that, in essence, Section 10.7 violates the *ex post facto* and due process provisions because it failed to give fair warning of the consequences of wholly lawful conduct in the year preceding the provision's enactment. *See Lerner v. Gill*, 751 F.2d 450, 454 (1st Cir.1985) ("The main purpose of the prohibition [on *ex post facto* laws, and, by implication, retroactive enactments] is to assure that legislative acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed").

### 1. Ex Post Facto Claim

■ The Supreme Court maintains that [i]t is settled, by decisions of this Court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done ... is prohibited as *ex post facto*. *Dobbert v. Florida*, 432 U.S. 282, 292, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 (1977), *quoting Beazell v. Ohio*, 269 U.S. 167, 169–170, 46 S.Ct. 68, 68–69, 70 L.Ed. 216 (1925) (Stone, J.). To violate the *ex post facto* provision a statute must impose "criminal" punishments upon acts that were non-criminal were done. *Haisiades v. Shaughnessy*, 342 U.S. 580, 594, 72 S.Ct. 512, 521, 96

L.Ed. 586 (1952) ("It always has been considered that that which it forbids is penal legislation ..."); *United States Trust Co. v. New Jersey*, 431 U.S. 1, 17 n. 13, 97 S.Ct. 1505, 1515 n. 13, 52 L.Ed.2d 92 (1977) ("*ex post facto* [clause] ... limit[s] the powers of the States only with regard to the imposition of punishment").

Under Massachusetts law, fines for the violation of a zoning ordinance are enforceable through indictment and are considered criminal. *See* Mass.Gen.L. ch. 40, § 21;[24] *Commonwealth v. Sostilio*, 351 Mass. 419, 420–22, 221 N.E.2d 764 (1966) (towns are authorized to impose criminal penalties for violations of provisions of zoning by-laws). In fact, Section 10.9 of the Somerville Ordinance specifically provides for the statutorily authorized maximum criminal penalties for violations of any provision—plainly including Section 10.7—of the Article. Section 10.9 provides:

> *Penalty for Violation.* Whoever violates any provision of this Article shall be punished by a fine of not more than Three Hundred Dollars ($300.00). Each day that a violation continues shall be punishable as such.

Ackerley maintains that Section 10.9 in connection with Section 10.7 constitutes an *ex post facto* law because it punishes as a crime Ackerley's act of displaying commercial messages upon its off-premise Somerville billboards during the July 28, 1985—July 28, 1986 period, a time when this act was lawful. This is simply a misconstruction of revised Section 10 of the Ordinance.

Revised Section 10 does not criminalize Ackerley's use of its billboards to display commercial off-premise messages during a period when it was lawful so to use them. It simply subjects Ackerley to criminal penalties if it fails to remove those non-conforming signs, that it used to display commercial messages during the July 28, 1985

—July 28, 1986 period, "within 120 days of the effective date of this Article...." Section 10.7.3. In fact, in a Stipulation filed with me on November 13, 1986, Somerville expressly agreed that it would not seek to impose a penalty—criminal or otherwise—on Ackerley for any alleged violation of the Ordinance until ten days after the conclusion of this case. Somerville has not only declined to seek criminal penalties against Ackerley for its conduct during the year preceding the effective date of the Ordinance, it has afforded Ackerley the time necessary for the resolution of this action as, in effect, a grace period beyond the 120 days provided for in Section 10.7.3.

The criminal punishments provided in Section 10 relate to prospective failures to comply with the terms of the Article; they are not sanctions for past activity. If the Ordinance had subjected Ackerley to criminal penalties for each day that one of its off-premise Somerville billboards had displayed a commercial message during the year prior to the effective date of the Ordinance, then revised Article 10 would have engaged the constitution's prohibition on *ex post facto* laws. But the Ordinance as enacted does not do this.

Section 10.7 merely identifies a class of signs as subject to prohibition by virtue of the use to which they were put during the one year period prior to the effective date of revised Article 10.7. It does not criminalize the innocent use of those signs during the period July 28, 1985—July 28, 1986. The provision is a mechanism for the identification of signs whose continued presence may cause punishment in the future. Accordingly, revised Article 10 does not implicate *ex post facto* considerations.

## 2. Due Process Claim

■ Retroactive laws may violate the Due Process Clause of the Fourteenth

---

24. Mass.Gen.L. ch. 40, § 21 provides in relevant part that:

> Towns may, for the purposes hereinafter named, make such ordinances and by-laws, not repugnant to law, as they may judge most conducive to their welfare, which shall be binding upon all inhabitants thereof and all persons within their limits. They may, except

as herein provided, affix penalties for breaches thereof not exceeding three hundred dollars for each offense, which shall enure to the town or to such uses as it may direct. Notwithstanding the provisions of any special law to the contrary, fines shall be recovered by indictment or on complaint before a district court....

Amendment by failing to give persons reasonable notice of, and a reasonable opportunity to conform their behavior to, the prohibitions that the laws create. Retroactive laws must be "harsh and oppressive [in their application, before they will be held] ... to transgress the constitutional limitation [of due process]." *Welch v. Henry*, 305 U.S. 134, 147, 59 S.Ct. 121, 125–26, 83 L.Ed. 87 (1938); *United States Trust Co. v. New Jersey*, 431 U.S. at 17 n. 13, 97 S.Ct. at 1515 n. 13 ("The Due Process Clause of the Fourteenth Amendment generally does not prohibit retrospective civil legislation, unless the consequences are particularly 'harsh and oppressive' ").

To be sure, "retroactive legislation does have to meet a burden not faced by legislation that has only future effects. '... The retroactive aspect of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former.' " *Pension Benefit Guaranty Corp. v. R.A. Gray & Company*, 467 U.S. 717, 104 S.Ct. 2709, 2718, 81 L.Ed.2d 601 (1984) (citation omitted). As the First Circuit has observed, retrospective laws often bring with them the harsh consequence of unsettling settled rights; and, therefore, "they deserve a special scrutiny." *Adams Nursing Home of Williamstown, Inc. v. Mathews*, 548 F.2d 1077, 1080 (1st Cir.1977).

The Supreme Court's "cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations. [citations omitted] This is true even though the effect of the legislation is to impose a new duty or liability based on past acts." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16, 96 S.Ct. 2882, 2893, 49 L.Ed.2d 752 (1976).

Revised Article 10 does

not penalize [Ackerley] for any conduct which, when engaged in, was permitted. At most [it] abrogate[s], for the future only, expectations [Ackerley] may have

acquired in the past. But all changes in the law dash expectations when they make tomorrow's rules different from yesterday's; that is not enough to create a 'retroactive' law.

*South Terminal Corporation v. Environmental Protection Agency*, 504 F.2d 646, 678 (1st Cir.1974). *See also Usery*, 428 U.S. at 16, 96 S.Ct. at 2892–93; *Reynolds v. United States*, 292 U.S. 443, 449, 54 S.Ct. 800, 803, 78 L.Ed. 1353 (1934) ("A statute is not rendered retroactive merely because the facts or requisites upon which its subsequent action depends, or some of them, are drawn from a time antecedent to the enactment").

The Supreme Court has stated that

the strong deference accorded legislation in the field of ... economic policy is no less applicable when that legislation is applied retroactively. Provided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches.... [The test of due process] is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose.

*Pension Benefit Guaranty Corp.*, 104 S.Ct. at 2718.[25]

It bears emphasizing that the regulation of billboards had been under consideration in Somerville nearly ten years when revised Article 10 was enacted. *Metromedia* and Judge Young's 1985 decision in the previous litigation between Ackerley and Somerville clearly identified that noncommercial speech would be entitled to special protections. Ackerley, however, chose, for what it perceived to be good business reasons, not to shift its inventory into the protected category, at least not until required to do so. Ackerley chose to operate in a business in which the prospects of prohibitory regulation were high for all but noncommercial signs. This is hardly an area in

---

**25.** I recognize, of course, that *Pension Benefit Guaranty Corp.* addressed these issues in the context of pure economic legislation. I have, however, already addressed in Section I.A. the

more stringent First Amendment analysis of the Somerville enactment; and the retroactivity claim may be viewed solely as a land use regulation at this point in the discussion.

which the percipient had reasonable cause to believe that its expectations could reasonably be settled.

Here, as I have already found, the retroactive provision of revised Article 10 was created to prevent a potential evasion of the initial revision's predominate concern: to eliminate as many billboard structures as possible. The retroactive provision represents a rational means of expediting Somerville's arrival at the important governmental destination of beautifying the City. Accordingly, the retrospective quality to Section 10.7.1 does not violate the constitutional test of due process.

### C. "Taking" Claim

■ Ackerley's final contention is that, even if otherwise constitutionally valid, revised Article 10 deprives Ackerley of its property without just compensation in violation of the Fifth and Fourteenth Amendments. Ackerley maintains that enforcement of Article 10 as an exercise of Somerville's zoning power represents a compensable taking under the Fifth Amendment because Ackerley has been deprived of all economically viable use of its Somerville property.

Ackerley maintains that the "property" which Somerville has "taken" without just compensation consists of: (1) its leases; (2) its OAB permits, which it characterizes as renewable rights to maintain outdoor signs; (3) tangible leasehold improvements; and (4) the actual physical structures which support the billboard messages.

Somerville has replied to Ackerley's "takings" claim by arguing that: (1) the ordinance does not constitute a "taking" under the teachings of *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 138, 98 S.Ct. 2646, 2666, 57 L.Ed.2d 631 (1978) [26]; (2) the interests of the plaintiff that have been taken are not compensable property interests; and (3) even if there were a taking of compensable property interests,

additional compensation is unnecessary because Ackerley has been afforded more than reasonable time to amortize its billboards.[27]

I recognize that under certain circumstances a zoning ordinance, valid in all other respects, may be an unconstitutional taking without just compensation, if it "does not substantially advance legitimate state interests ... or denies an owner economically viable use of his land." *Agins v. City of Tiburon*, 447 U.S. at 260, 100 S.Ct. at 2141 (citations omitted). Indeed, the "takings" area is one in which recent Supreme Court activity is likely to generate further litigation seeking to clarify when and how the circumstances of government regulation implicate constitutional protections against uncompensated takings. *See generally* Epstein, *Takings: Descent and Resurrection* 1987 S.Ct.Rev. 1; *see also Nollan v. California Coastal Commission,* — U.S. —, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987); *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* — U.S. —, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987); *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). I will not, however, decide whether those protections are implicated here, because the plaintif's "takings" claim is not ripe for review in this court.

As the First Circuit has held, "exhaustion of state law remedies—whatever form they may take—is a precondition to the maintenance of a federal damages action under the Takings Clause," unless the remedy available under state law is "so illusory as to call for a departure from the usual rule." *Ochoa Realty Corp. v. Faria*, 815 F.2d 812, 817 (1st Cir.1987).

This is because, as the Supreme Court has observed

[t]he Fifth Amendment does not proscribe the taking of property; it pro-

---

**26.** *See also Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980).

**27.** For amortization purposes, Somerville alleges that Ackerley has had available to it: the

five-year grace period of the 1977 Ordinance; the time that has elapsed during the pendency of this action; and the 120-day period provided by the challenged Ordinance.

scribes taking without just compensation.... Nor does the Fifth Amendment require that just compensation be paid in advance of, or contemporaneously with, the taking; all that is required is that a 'reasonable, certain and adequate provision for obtaining compensation' exist at the time of the taking.

*Williamson County Regional Planning Commission v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 3121, 87 L.Ed.2d 126 (1985) (citations omitted).

Under Massachusetts state law, there is nothing illusory about the remedy available to persons aggrieved by an alleged taking. Mass.Gen.L. ch. 79, § 10 provides a specific statutory remedy for government actions which amount to a taking without formal condemnation proceedings. Damages under Section 10 are assessed in the same manner as in actions based on formal takings and the relief available appears to be as complete. *See Fram v. City of Boston,* 363 Mass. 68, 72, 292 N.E.2d 356 (1973) ("If there had been a 'taking' of the plaintiff's property other than pursuant to a formal vote of the authority, the plaintiff would still have been entitled to petition for the assessment of damages. See G.L. c. 79, Sec. 10").

Chapter 79, § 10 provides a "reasonable, certain and adequate" mechanism for obtaining just compensation for an alleged taking. It enables an aggrieved property holder to bring an action in state court for an assessment of damages. *See* Mass. Gen.L. ch. 79, Sec. 14 ("A person entitled to an award of his damages under this chapter ... whether a petition has or has not been filed or award made under section ... ten, may petition for the assessment of such damages to the superior court of the county in which the property taken or injured was situated").

In the instant case, Ackerley has not exhausted this nonillusory remedy available to it under Massachusetts law. Consequently, Ackerley's Fifth Amendment tak-

ings claim must be dismissed "as premature." *Ochoa Realty,* 815 F.2d at 817. This is in accord with the "substantial body of First Circuit precedent, recently reaffirmed, which has consistently abjured recognition of a federal damage remedy under 42 U.S.C. § 1983 in inverse condemnation actions." *Id.* at 816.

### III.  CONCLUSIONS OF LAW—THE ENFORCEMENT COUNTERCLAIM

■■■ Somerville has brought a counterclaim against Ackerley for enforcement of Article 10. The counterclaim is based upon Mass.Gen.L. ch. 40A, § 7 and Mass.Gen.L. ch. 93, § 31. The defendant seeks to have this court: (1) declare that Ackerley's Somerville billboards are nonconforming signs subject to removal under Article 10; (2) enjoin the continued maintenance by Ackerley of its nonconforming signs; and (3) order removal of all of Ackerley's nonconforming signs no later than 120 days after the court's judgment.

Ackerley has replied to the counterclaim by raising both factual and legal arguments, all of which turn on questions of state law. Ackerley also sought, prior to trial, to dismiss the counterclaim on the ground that the interests of "judicial economy, convenience and fairness to litigants" [28] would more properly be served if I were to decline jurisdiction and enable the defendants' state law counterclaim to be heard in the state courts. I deferred ruling on Ackerley's motion at the time of trial. Having reviewed the evidence, I am now persuaded of the wisdom of the course recommended by Ackerley. Accordingly, I will allow Ackerley's motion to dismiss the defendants' counterclaim. My dismissal of the counterclaim is, of course, without prejudice, and thereby permits the request for relief in the counterclaim to be refiled in a competent state court, where the federal constitutional rulings made herein will be entitled to collateral estoppel effect.[29]

I have decided not to exercise what amounts to pendent jurisdiction over the

---

**28.** *Charles D. Bonanno Linen Service, Inc. v. McCarthy,* 708 F.2d 1, 6 (1st Cir.), *cert. denied,* 464 U.S. 936, 104 S.Ct. 346, 78 L.Ed.2d 312 (1983). *See also United Mine Workers v. Gibbs,*

383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed. 2d 218 (1966).

**29.** Of course, the free speech protections afforded by Article 16 of the Massachusetts Declara-

defendants' state law counterclaim, because I am persuaded that the ends of judicial economy, convenience and fairness to litigants which pendent jurisdiction is designed to serve, will be accomplished better if the counterclaim is heard in state court.

The plaintiff's claims, considered in Section II of this Memorandum, turned entirely on questions of federal constitutional law. By contrast, the defendants' counterclaim raises wholly independent questions of state zoning law and procedure. Massachusetts has constructed an elaborate system for zoning regulation, and has paid careful attention to designation of the appropriate forum for judicial resolution of its zoning enforcement disputes.[30] Massachusetts state courts are more familiar with and, consequently, more able to consider sensitively and expeditiously questions of state law arising in the context of this regulatory regime.[31]

## CONCLUSION

For the reasons set forth above, a judgment shall enter declaring revised Article

10 of the Zoning Ordinance of the City of Somerville to be in accordance with federal constitutional requirements and dismissing the plaintiff's takings claim as well as the counterclaim of the defendant City of Somerville.

## JUDGMENT

In accordance with the findings of fact and conclusions of law set forth in the Memorandum issued this day in this matter, it is hereby ORDERED, ADJUDGED and DECREED:

1. That the revision to Article 10 of the Zoning Ordinance of the City of Somerville enacted on July 28, 1986, is in accordance with federal constitutional requirements;

2. That the "takings" claim of the plaintiff Ackerley be dismissed for failure to exhaust state remedies; and

3. That the counterclaim of the defendant City of Somerville be dismissed without prejudice to reinstitution in a competent state court.

---

tion of Rights may present different considerations. I have not been presented with—and I express no views regarding—the degree to which, if at all, Article 16 may provide greater protections to Ackerley from the prohibitions of revised Article 10. *See generally* Wilkins, *Judicial Treatment of the Massachusetts Declaration of Rights in Relation to Cognate Provisions of the United States Constitution,* XIV Suff.U.L.Rev. 886, 897–909 (1980).

**30.** *See generally* Mass.Gen.L. ch. 40A, §§ 1–17; Mendler Massachusetts Conveyancers' Handbook with Forms ("Mendler"), § 11:1–11:7 (1984); *Walker v. Board of Appeals of Harwich,* 388 Mass. 42, 445 N.E.2d 141 (1983). Chapter 40A, § 7 provides that "[t]he superior court shall have jurisdiction to enforce the provisions of this chapter, and any ordinances or by-laws adopted thereunder, and may restrain by injunction violations thereof." However, under Section 17, any person aggrieved by a decision of a board of appeals or any special permit granting authority may seek judicial review not only in the superior court, but in the land court or district court, or, in Hampden County, the housing court. *See Walker,* 388 Mass. at 45, 445 N.E.2d 141 ("Under G.L. c. 40A, § 17, as amended by St.1978, c. 478, § 32, there is concurrent jurisdiction in the District and Superior Court Departments to hear zoning cases"). *See also* Section 8 which provides for "appeal to the

permit granting authority." The remedies provided in these statutory sections are exclusive. *See* Section 7, para. 2 ("No action, suit or proceeding shall be maintained in any court, nor any administrative or other action taken ... by reason of any violation of any zoning by-law or ordinance except in accordance with the provisions of this section, section eight and section seventeen ..."); Mendler, § 11:6.01 at 268 and 268 n. 19.

**31.** *See, e.g., Colorado River Water Conservation District v. United States,* 424 U.S. 800, 814, 96 S.Ct. 1236, 1244–45, 47 L.Ed.2d 483 (1976) (federal courts should abstain where deciding a claim "would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern"); *Alabama Public Service Commission v. Southern Railway Co.,* 341 U.S. 341, 349–50, 71 S.Ct. 762, 768–69, 95 L.Ed. 1002 (1951) (where "predominantly local factors" are at issue and "intervention of a federal court is not necessary for the protection of federal rights" comity suggests abstention by the District Court); *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943) (federal court should abstain from resolving issues involving specialized and complicated regulatory system under state law). *See also Friends of Children, Inc. v. Matava,* 766 F.2d 35, 37 (1st Cir.1985); *Allstate Insurance Co. v. Sabbagh,* 603 F.2d 228, 230 (1st Cir.1979).

## APPENDIX A

## ORDINANCE NO. 1986-2

An Ordinance Further Amending Ordinance No. 1977-14 as amended by the Board of Aldermen.

SECTION 1. The Zoning Ordinance of the City of Somerville, Ordinance No. 1977-14 as amended by the Board of Aldermen, is further hereby amended as follows:

A. By striking therefrom Subsection 2.2.49 and renumbering existing Subsections 2.2.50 through 2.2.65 accordingly.

B. By striking therefrom the entire text of Article 10 and inserting in place thereof a new Article 10 as follows:

ARTICLE 10

Section 10.1. *Findings and Purpose.*

Section 10.1.1. This Article is based upon the following findings:

(a) The regulation of signs is necessary in order to preserve and enhance the substantial governmental interests of the City of Somerville in its natural, scenic, historic, cultural, and aesthetic qualities;

(b) There is a substantial governmental interest in enhancing the physical appearance of all parts of the City of Somerville, including residential, commercial, and industrial areas;

(c) Regulating signs will improve the City's appearance, thereby attracting both permanent residents and commercial development;

(d) The regulations set forth in this Article will directly advance the public interest in aesthetics and other qualities by preserving and enhancing the appearance of residential, commercial and industrial areas; preserving and enhancing the appearance of public streets, parks and other public properties; and by minimizing the intrusiveness of sign structures.

Section 10.1.2. The purposes of this Article are to preserve and enhance the substantial interests of the City of Somerville in the appearance of the City; to preserve and enhance the public interest in aesthetics; to preserve and increase the amenities of the municipality; to control and reduce visual clutter and blight; and to carry out the authority conferred by General Laws, Chapter 40A and Chapter 93, Section 29.

Section 10.2. *General Prohibition.* No sign may be erected, displayed or maintained except as specifically authorized by this Article.

Section 10.3. *Signs in Residence Districts.* In any Residence District (RA, RB and RC), signs are permitted provided they shall conform to the following requirements:

a. Signs may not exceed twelve (12) square feet in area; provided that signs accessory to a non-conforming use shall conform to the requirements of Section 10.4; provided further, that such signs may not exceed one-half the area authorized under Section 10.4.

b. Signs in connection with political campaigns shall be removed within thirty (30) days after the conclusion of the election.

c. Building contractors' signs may be maintained on buildings only while the same are actually under construction.

d. Signs in conjunction with a permitted nonresidential building or use may not be located nearer to a street lot line than one-half the depth of the required yard at that location.

Section 10.4. *Signs in Nonresidential Districts.*

10.4.1 In districts other than Residence Districts, signs are permitted provided that they shall conform to the requirements of subsections (a) through (h):

a. Any sign which conforms to the requirements of Section 10.3.

b. A wall sign attached parallel to a building which projects no more than fifteen (15) inches from the building surface, provided that the top of such sign is no higher than whichever of the following is lowest:

(1) twenty-five (25) feet above grade;

(2) the top of the sills of the first level of windows above the first story;

(3) the lowest point of the roof surface, except in the case of a one horizontal parapet, the top of said parapet.

c. A permanent non-illuminated sign on the inside of the glass of a window, provided that the total area of the sign does not exceed thirty (30) percent of the total glass area of windows of the building, or portion thereof, where the sign is located, and provided that signs on ground floor windows be included in calculating the total area of signs on a sign frontage.

d. A sign attached at right angles to a building, provided that such sign has no more than two (2) faces and:

(1) there is no more than one such sign for each entrance door;

(2) it projects no more than six (6) feet, plus a reasonable allowance for field fastening, from the building;

(3) the bottom of the sign is at least ten (10) feet from grade and its top is no higher than whichever of the following is lowest; twenty-five (25) feet above grade; the top of the sills of the first level of windows above the first story; or the lowest point of the roof surface, except in the case of a one-story building with a continuous horizontal parapet, the top of said parapet;

(4) the area of the sign shall not exceed twenty-four (24) square feet on either side, excepting that an additional ten (10) square feet on each face is allowed for a sign which incorporates a public service message device such as a time and temperature sign;

(5) there are no exposed guy wires or turnbuckles.

e. One free standing sign, provided that such sign has no more than two (2) faces and:

(1) if there is one use on the premises, the area of each face may not exceed sixty-five (65) square feet and the top of such sign may not be higher than twenty-five (25) feet above grade; or

(2) if there are two or more uses on the premises, the area of each face may not exceed one-hundred twenty-five (125) square feet and the top of such sign may not exceed thirty (30) feet above grade; excepting, however, that a premises with a street line or lines of two hundred (200) or more feet may have two (2) free standing signs, or a single sign which is two (2) times the area otherwise permitted.

f. Temporary signs pertaining to special sales or events may be affixed to windows provided that their total area does not exceed thirty (30) percent of the window area and provided that any such sign may not be posted more than thirty (30) days. No permit is required for any such temporary sign which is posted fifteen (15) days or less.

g. A sign painted on or attached to the face of, but not extending above, a canopy or marquee, or a sign attached to the underside of a canopy or marquee.

h. A sign painted on or attached to an awning.

Section 10.4.2. Signs shall be lighted only by any continuous light, except that a warning sign or a sign illuminated to show time and temperature, or some other public service message, may have intermittent illumination. Signs shall remain stationary.

Section 10.4.3. No support for a sign shall extend above the cornice line of a building to which it is attached.

Section 10.4.4. The area of signs shall be determined as follows:

a. For a sign, either free-standing or attached, the area shall be considered to include all lettering, working, and accompanying designs and symbols, together with the background, whether open or enclosed on which they are displayed, but not including any supporting framework and bracing which are incidental to the display itself.

b. For a sign painted upon or applied to a building, the area shall be considered to include all lettering, wording, and accompanying designs or symbols together with any backing of a different color than the finish material of the building face.

c. Where the sign consists of individual letters or symbols attached to or painted on a surface, building, wall or window, the area shall be considered to be that of the smallest rectangle or other geometric shape which encompasses all of the letters and symbols.

d. In calculating the permitted sign area, the sign frontage shall be understood to mean the length of a building along a public way occupied by a separate and distinct use or that length of a building that is set back from, but facing a public way where such a sign would be highly visible. The total area in square feet of all permanent signs on a sign frontage, except for signs on windows above the first floor, free standing signs, directional and public purpose signs shall not exceed the sign frontage multiplied by the appropriate factor from the table below.

| Average distance of Sign From Center Line of Abutting Street | Sign Frontage Multiplied By |
| --- | --- |
| | 2 |
| 0 –99 | 3 |
| 100 –399 | 5 |
| 400 and over | |

Excepting that a use with less than twenty-five (25) feet of sign frontage may have a maximum of fifty (50) square feet of permanent signs.

e. The distance of a sign on or under a canopy, marquee or awning from the center line of an abutting street shall be construed to be the same as if such sign were attached to the building to which the said canopy, marquee or awning is attached.

Section 10.5. *Parking and Directional Signs.*

Section 10.5.1. In the interest of public safety and convenience, there shall not be any sign on a parking garage, in any district, except:

a. At each vehicular entrance, one sign attached at right angles to the building which shall bear thereon in fifty (50) percent or more of its total sign area a blue rectangle with a white letter "P" in san serif gothic type face, the letter "P" being not less than fifty (50) percent of the area of that blue rectangle.

b. At each vehicular entrance, one optional sign directly above, and the exact full width of, that entrance, and not to exceed two (2) feet in height.

c. A sign bearing only that information and at that location as may be required by the Traffic Department and directional signs. The area of the sign containing the "P" shall not exceed a height of twenty-five (25) feet above grade and for parking lots may be free standing.

Section 10.5.2. Directional signs necessary for public safety and convenience which do not exceed twelve (12) square feet per face and which bear no other message. Such signs are not counted in computing total sign area allowed by this Article.

Section 10.6. *Pertinence to Other Laws.*

Section 10.6.1. All signs shall be subject to the State Building Code and, when applicable, the Zoning Ordinance and the regulations of the Board of Aldermen regulating signs, etc. projecting into, on, or over a public street or way.

Section 10.6.2. This Article shall not be construed as to be inconsistent with or in contravention to Sections 29 through 33 inclusive of Chapter 93 or Section 8 and 9 of Chapter 85 of the General Laws, as amended.

Section 10.7. *Nonconforming Signs.*

Section 10.7.1. This Article shall apply to any nonconforming sign which at any time during the year preceding the effective date of this Article, or at any time thereafter, advertises or promotes the sale of goods, products, or services not sold, provided, or manufactured upon the same premises on which the sign is located.

Section 10.7.2. Except as provided in Section 10.7.1, this Article shall not apply to any nonconforming sign legally erected prior to the effective date of this Article.

Section 10.7.3. All nonconforming signs subject to Section 10.7.1 shall be removed within 120 days of the effective date of this Article or within 120 days of the date on

which the sign first becomes subject to Section 10.7.1, whichever occurs later.

Section 10.7.4.  Any legally erected non-conforming sign which has been destroyed or damaged to such an extent that the cost of restoration would exceed thirty-five (35) percent of the replacement value of the sign at the time of the destruction or damage, shall not be repaired, rebuilt or altered except in accordance with the provisions of this Article.

Section 10.7.5.  An electric time and temperature sign which is an integral part of a legally erected nonconforming sign may be repaired or replaced with no restriction on the cost of repair or replacement.

Section 10.8.  *Enforcement.*  This Article shall be enforced by the Building Superintendent.  The Building Superintendent shall not issue a permit for the erection, maintenance, enlargement, or alteration of any sign which is not in conformance with this Article.

Section 10.9.  *Penalty for Violation.* Whoever violates any provision of this Article shall be punished by a fine of not more than Three Hundred Dollars ($300.00). Each day that a violation continues shall constitute a separate offense and shall be punishable as such.

Section 10.10.  *Severability.*  The invalidity of any section or provision of this Article shall not invalidate any other section or provision hereof.

SECTION 2.  This ordinance shall take effect upon its passage by the Board of Aldermen and approval. by the Mayor.

/s/   Cathleen O'Dea
Ald. Cathleen O'Dea

DATE    MAR 10 1987

A TRUE COPY ATTEST:

_William J. Donovan_
CITY CLERK

145043

ORDINANCE NO- 1986-**2**

AN ORDINANCE FURTHER AMENDING ORDINANCE
No. 1977-14 AS AMENDED BY THE BOARD OF
ALDERMEN.

*76*

Approved July 28 19 ~~

~~~~~~~~~~~~~~~~~
MAYOR

8/19/86 – cc:  Commr. of P.W.
Supt. of Highways
Supt. of Bldgs.
Supt. of Elec. Lines & Lights
Solicitor
Chief of Police
OPCD
Assessor
Counter Drawer

IN BOARD OF ALDERMEN
JUL 24 1986
"READ TWICE AND UNDER SUSPENSION
OF RULES PASSED TO BE ENROLLED.

SOMERVILLE.
JUL 24 1986
Enrolled

IN BOARD OF ALDERMEN
Passed to be ordained JUL 24 1986
President
Attest
Clerk

SEE # 145705